41 F.3d 1223
 96 Ed. Law Rep. 98, 8 A.D.D. 373
 Martin LIGHT; Diane Light; Lauren Light, a minor by and
through Martin and Diane Light, her next friends;
Appellants;
v.
PARKWAY C-2 SCHOOL DISTRICT; Special School District of St.
Louis County; Appellees.
 No. 94-2333.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1994.
Decided Dec. 2, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Jan. 11, 1995.
 
 Michael H. Finkelstein, Jefferson City, MO, argued (Kevin Thompson and Sara Thompson, on the brief), for appellants.
 James G. Thomeczek, St. Louis, MO, argued (Teri Goldman, on the brief), for appellees.
 Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 This appeal concerns a school district's attempt to change the educational placement of an allegedly dangerous mentally disabled child. Two issues are raised on appeal: (1) whether the Supreme Court's holding in Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), requires a district court to find that a child is not only "substantially likely to cause injury" but also "truly dangerous" before sanctioning a transfer, and (2) whether a school district must make a reasonable accommodation of the child's disability before it can change her placement. We reject the former contention, but agree with the latter. We hold that the district court in this case erred by refusing to consider whether Lauren Light's disabilities had been reasonably accommodated. Nevertheless, based upon our independent review of the record, we conclude that a reasonable accommodation was made, and we affirm the court's order that Lauren Light be removed from her current placement.
 
 I. FACTUAL BACKGROUND
 
 2
 Lauren Light is a thirteen-year-old child with multiple mental disabilities. She has been diagnosed at various times as demonstrating behavioral disorder, conduct disorder, pervasive developmental disorder, mild to moderate mental retardation, certain features of autism, language impairment, and organic brain syndrome. Behind these diagnostic labels stands a child whose condition leaves her prone to impulsive, unpredictable, and aggressive behavior. According to her parents, Lauren is "sometimes defiant, easily frustrated, irritable, impulsive, and easily distracted." Plaintiffs' Motion for Temporary Restraining Order at 2. Moreover, Lauren "sometimes exhibits aggressive behaviors such as kicking, biting, hitting and throwing objects." Id.
 
 
 3
 For the 1993-94 school year, Lauren was enrolled in a self-contained classroom for students with mental disabilities at Parkway Central Middle School, a public middle school in Chesterfield, Missouri. The classroom is operated by the Special School District ("SSD") of St. Louis County, a public entity devoted to educating children with special needs. During the prior school year, Lauren had been placed in a self-contained classroom at Riverbend Elementary School. Seeking greater educational opportunities for Lauren, her parents advocated for and obtained a transfer to Parkway Central Middle School, arguing that Lauren's behavior might improve amid similarly-aged peers.
 
 
 4
 Federal law requires disabled children like Lauren to be educated pursuant to an Individualized Education Program ("IEP"), a comprehensive document which sets forth objectives, policies, and guidelines and which governs their day-to-day schooling. Developed by a team of educators, specialists, consultants, administrators, and her parents, Lauren's IEP outlined an extensive set of duties on the part of the SSD to accommodate Lauren's disabilities. Lauren's IEP required that she have two-on-one staff support at all times. Thus, in addition to the classroom teacher assigned to her room, Lauren was accompanied by one full-time teacher, Jane Galownia, and one full-time teacher's assistant, Lynn Wilson, throughout the school day. Both Galownia and Wilson have been certified by the State of Missouri to teach students with mental handicaps, behavioral disorders, and learning disabilities.
 
 
 5
 In addition, the SSD provided special training to members of the staff who regularly came into contact with Lauren, including training in behavior management, inclusion, and crisis prevention and intervention. To ease the transition from Riverbend, the SSD agreed to retain the services of a consultant selected by the Lights, Mary Granville of the Judevine Center for Autistic Children. Granville had worked with Lauren at Riverbend to facilitate her inclusion in the regular school environment, and performed a similar role in planning for and assisting with Lauren's transition to Parkway Central Middle School. Lauren's curriculum included speech therapy, occupational therapy, physical therapy, instruction in daily living skills, adapted physical education, functional academics, and weekly community access opportunities. Lauren's teachers kept daily logs of her activities and behavior and provided daily reports to her parents. Outside of the special education classroom, Lauren was enrolled in several courses in the regular classroom setting with her nondisabled peers, including physical education, art, computer lab, home economics, and library. The SSD provided staff support for Lauren to participate in after-school activities. In September of 1993, the SSD agreed to a request by Lauren's parents that she be provided music therapy twice a week. When Lauren's music therapist became ill, the SSD hired a replacement and increased the frequency of the lessons to three a week to make up for lost instructional time. No other SSD student was provided with music therapy.
 
 
 6
 At Parkway Central Middle School, Lauren exhibited a steady stream of aggressive and disruptive behaviors, such as biting, hitting, kicking and poking persons, throwing objects, and turning over furniture. School records document that in the two years prior to her suspension Lauren committed eleven to nineteen aggressive acts per week, with a mean of fifteen per week. Her daily tally of aggressive acts ranged from zero to nine, with a mean of three per day. Of these incidents, approximately thirty required the attention of the school nurse.
 
 
 7
 The record suggests that Lauren's aggressive behaviors had a negative effect on the educational progress of the five other special education students in Lauren's program. The teacher in charge of the self-contained classroom, Suzanne Seibel, reported that the class was rarely able to complete lesson plans due to Lauren's frequently disruptive behavior. In letters to the director of special education for the SSD, parents of some of the other students in Seibel's class expressed concerns that the classroom environment had become tense and stressful, that their children's academic and social progress had slowed or halted, and that the class's field trip schedule had been significantly curtailed. One student required after-school academic support to compensate for the disruptions caused by Lauren's behavior.
 
 
 8
 Beginning in November 1993, members of Lauren's IEP team began a process of re-evaluation. Together with Lauren's parents and their attorney, the IEP team met for a full day on March 23, 1994. The team concluded that a change of placement was in Lauren's best interest. Also on the agenda was the request of Lauren's art teacher that Lauren be removed from the art class due to her consistently disruptive behavior toward the other students. The Lights objected to any such removal and requested an administrative hearing on that issue. As a result, the Lights invoked the "stay-put" provision of 20 U.S.C. Sec. 1415(e), which stayed any change in Lauren's placement pending the resolution of the administrative proceedings. The team, the Lights and their attorney reconvened on April 6, 1994, to complete the proposed revision of Lauren's IEP, and to address the team's conclusion that Lauren should be moved to a self-contained classroom for children with autism in a neighboring school district. Lauren's parents disagreed with any change in her placement and exercised their procedural due process rights under federal and Missouri law.
 
 
 9
 On April 12, during art class, Lauren grabbed and tugged the hand of another special education student. With her free hand, Lauren then hit the student three times on the head. Later that day, following an informal hearing at which neither of Lauren's parents was present, the principal of Parkway Central Middle School imposed a ten-day suspension on Lauren for her behavior. Under federal and Missouri law, a suspension of ten days or less does not constitute a change of placement, and thus will not invoke the stay-put requirement. Mo.Rev.Stat. Sec. 167.171 (1986).
 
 II. PROCEDURAL HISTORY
 
 10
 Lauren's parents brought this action in the district court seeking to have the suspension lifted because Lauren was not afforded due process. Parkway School District and the SSD counterclaimed and invoked the court's equitable power to remove Lauren from Parkway pending the resolution of the Lights' administrative challenge to the proposed revisions to Lauren's IEP, including the proposed change in placement. 20 U.S.C. Sec. 1415(e)(2). Parkway and the SSD argued that Lauren's aggressive behaviors presented a substantial risk of injury to herself and others in her current educational placement. After one day of testimony, the district court ruled that Lauren had been denied due process and granted the Light's motion for a temporary restraining order. Noting that her parents were not specifically informed of the suspension hearing, the court apparently believed that Lauren's disabilities rendered her unable to advocate on her own behalf and unable to understand why she was being suspended. Following two additional days of testimony, however, the court vacated the temporary restraining order and instead granted the school districts' motion for an injunction removing Lauren from Parkway Central Middle School. The court found that "maintaining Lauren in her current placement is substantially likely to result in injury either to herself or to others." The court refused to inquire into the adequacy of the school districts' efforts to accommodate Lauren's disabilities. The court further declined to make any assessment as to the best alternative placement for Lauren.
 
 
 11
 III. THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT
 
 
 12
 The Individuals With Disabilities Education Act (IDEA) codifies the goal that "all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. Sec. 1400(c). Like its predecessor statute, the Education for All Handicapped Children Act of 1975, the IDEA provides certain federal funds to states whose policies "assure[ ] all children with disabilities the right to a free appropriate public education." Id. Sec. 1412(1).
 
 
 13
 At the heart of the IDEA lie two broad mandates, one substantive and one procedural. First, the IDEA seeks to guarantee the educational rights of disabled children by requiring policies of inclusion. Specifically, schools must
 
 
 14
 assure that, to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....
 
 
 15
 Id. Sec. 1412(5)(B). As the Third Circuit has recently reiterated, "this provision sets forth a 'strong congressional preference' for integrating children with disabilities in regular classrooms." Oberti v. Board of Educ., 995 F.2d 1204, 1213-14 (3rd Cir.1993) (citations omitted). In the words of the implementing regulations, schools must educate disabled children in the "least restrictive environment." 34 C.F.R. Sec. 300.550.
 
 
 16
 Second, the IDEA mandates that participating states extend to disabled children, parents, teachers, school officials, and educational institutions a host of procedural protections and administrative safeguards. 20 U.S.C. Sec. 1415. Schools must afford parents of disabled children the opportunity to participate in educational decisions. States must establish an administrative review apparatus to resolve disputes between parents and school officials over, for example, the proper educational placement for a disabled child. Under the IDEA, parents are entitled to notice of proposed changes in their child's educational program and, where disagreements arise, to an "impartial due process hearing." Id. Sec. 1415(b)(2). Once the available avenues of administrative review have been exhausted, aggrieved parties to the dispute may file a civil action in state or federal court. Id. Sec. 1415(e)(2).
 
 
 17
 The IDEA includes a "stay-put" provision, under which the disabled child "shall remain in the then current educational placement of such child" during the pendency of administrative or judicial review, unless "the State or local educational agency and the parents or guardian otherwise agree on an interim placement." Id. Sec. 1415(e)(3). By preserving the status quo ante, the stay-put provision ensures an uninterrupted continuity of education for a disabled child pending administrative resolution. See Logsdon on Behalf of Logsdon v. Board of Educ. of Pavilion Cent. School Dist., 765 F.Supp. 66 (W.D.N.Y.1991).
 
 
 18
 In Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), the Supreme Court declined to find an implied exception to the stay-put provision for assertedly "dangerous" children. The Court held that Congress intended "to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." Id. at 323, 108 S.Ct. at 604 (emphasis in original). A school seeking to remove a dangerously disruptive child from her current educational placement can overcome the automatic stay-put injunction only by obtaining the permission of the parents or the equitable sanction of a court. Acting alone, school officials are restricted to " 'normal procedures for dealing with children who are endangering themselves or others,' " such as "study carrels, timeouts, detention, or the restriction of privileges." Id. at 325, 108 S.Ct. at 605 (quoting Comment following 34 C.F.R. Sec. 300.513 (1987)). In addition, "where a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for up to 10 school days." Id.
 
 
 19
 Emphasizing that the IDEA "does not leave educators hamstrung," id. at 325, 108 S.Ct. at 605, the Supreme Court outlined the standard for judicial intervention when a school is confronted with a dangerous student:
 
 
 20
 [S]chool officials are entitled to seek injunctive relief under Sec. 1415(e)(2) in appropriate cases. In any such action, Sec. 1415(e)(3) effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others.
 
 
 21
 Id. at 328, 108 S.Ct. at 606.
 
 
 22
 This test looks only to the objective likelihood of injury. We reject as tautological the contention of Lauren's parents that a disabled child must be shown to be "truly dangerous" as well as substantially likely to cause injury. Their argument derives from a misreading of Honig and warrants no extensive rebuttal. More importantly, we reject their suggestion that schools can only remove children who intend to cause injury. The Lights argue that a mentally disabled child cannot be a "dangerous" child within the meaning of Honig when that child's disability renders her unable to intend the injuries she inflicts. A child's capacity for harmful intent plays no role in this analysis. Even a child whose behaviors flow directly and demonstrably from her disability is subject to removal where that child poses a substantial risk of injury to herself or others. We note that in the case of dangerous disabled children the purpose of removal is not punishment, but "maintaining a safe learning environment for all ... students." Id. Moreover, the removal of a dangerous disabled child from her current placement alters, but does not terminate, her education under the IDEA.
 
 
 23
 In addition to this threshold standard, we hold today that there is an essential second test which must be met by a school district seeking judicial sanction for the removal of a dangerous disabled child: The school district must show that it has made reasonable efforts to accommodate the child's disabilities so as to minimize the likelihood that the child will injure herself or others. This second inquiry is necessary to ensure that the school district fulfills its responsibility under the IDEA to make available a "free appropriate public education ... for all handicapped children...." 20 U.S.C. Sec. 1412(2)(B). While we do not intend to expand district court removal hearings into wide-ranging assessments of entire educational programs, we believe that school districts should not seek to remove disabled children until reasonable steps have been taken to mitigate the threat of injury. The scope of this inquiry is indicated by 20 U.S.C. Sec. 1412(5)(B), which requires that the "removal of handicapped children from the regular education environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...." Before exercising its equitable authority to remove a disabled child from any placement, a district court should be satisfied that the school district has made reasonable use of "supplementary aids and services" to control the child's propensity to inflict injury.
 
 
 24
 In sum, a school district seeking to remove an assertedly dangerous disabled child from her current educational placement must show (1) that maintaining the child in that placement is substantially likely to result in injury either to himself or herself, or to others, and (2) that the school district has done all that it reasonably can to reduce the risk that the child will cause injury. Where injury remains substantially likely to result despite the reasonable efforts of the school district to accommodate the child's disabilities, the district court may issue an injunction ordering that the child's placement be changed pending the outcome of the administrative review process.
 
 
 25
 IV. IS LAUREN'S PLACEMENT AT PARKWAY CENTRAL MIDDLE SCHOOL SUBSTANTIALLY LIKELY TO RESULT IN INJURY?
 
 
 26
 For reasons outlined above, we conclude that the district court properly understood the first prong of our two-part test. Reviewing the evidence of Lauren's disruptive behavior at Parkway Central Middle School, the district court expressed its conviction "that should this behavior continue in the Parkway [Central] Middle School, Lauren will either injure herself or another" and found that "maintaining Lauren Light in her current educational placement is substantially likely to result in injury either to herself or to others."These conclusions constitute findings of fact, which we must uphold unless clearly erroneous. Craft v. Metromedia, Inc., 766 F.2d 1205, 1212 (8th Cir.1985), cert. denied, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Deference is due "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." Id.
 
 
 27
 The record amply supports the district court's findings. The record exhaustively documents Lauren's almost daily episodes of aggressive behavior at Parkway Central Middle School. The undisputed testimony of several witnesses reveals that Lauren kicked, hit, and bit her teacher, Jane Galownia, at least several times a week. At various times, Lauren has hit, kicked, and slapped other disabled and non-disabled students; thrown pencils and other objects at other students' eyes, ears and faces; and attempted to overturn desks and tables. As noted above, Lauren's daily log has recorded a mean incidence of fifteen aggressive acts per week. Dr. Joseph Jones, the Director of Special Education for Lauren's region, testified that Lauren's aggressive behavior varies cyclically and might generate anywhere from zero to fifteen incidents on a given day.
 
 
 28
 The following undisputed incidents are illustrative of Lauren's capacity to inflict injury. On January 12, 1994, Lauren poked another student in the stomach with a pencil, slapped Galownia, slapped another student, and hit Galownia in the face with her head. On January 13, 1994, Lauren slapped Galownia twice. On January 31, 1994, Lauren grabbed Galownia's hand and bit down hard on her thumb for about fifteen seconds. Lauren released the thumb upon the intervention of Mary Granville, the specialist and consultant, who happened to be present that day for observation. On both February 1 and 2, 1994, when Galownia was assisting with the use of a sewing machine, Lauren bit her teacher's arm. On February 3, 1994, Lauren hit Galownia and threw a crayon at another student, striking him in the face.
 
 
 29
 On March 3, 1994, Lauren bruised a nondisabled student by slapping his face as she ran from the gym, and later bit Galownia on the hand. On March 18, 1994, while on a community access trip, Lauren dashed into the street at an intersection. After Galownia intervened to retrieve her, Lauren kicked Galownia and hit Suzanne Seibel. When they rejoined the group, Lauren kicked another student. On March 24, 1994, Lauren bit Galownia on the neck while giving her a hug. On April 12, 1994, Lauren grabbed the hand of another disabled student and struck him three times on the forehead and head, raising her hand back to her head with each blow. Later that day at the suspension hearing, Lauren kicked Galownia several times.
 
 
 30
 Our account of these behaviors is neither detailed nor complete, but serves only to illuminate our holding that the district court's findings are not clearly erroneous.
 
 
 31
 In addition, the district court heard testimony that Lauren had occasionally engaged in behaviors which threatened injury to herself. Lauren frequently placed objects in her mouth, including toxic markers. Dr. Toni Strieker, the Area Coordinator for the SSD, testified that other students at Parkway were aware of Lauren's pattern of physical aggression and were likely to strike back at her to defend themselves when attacked. Dr. Joseph Jones, the Director of Special Education for Region V in the SSD, testified that other students displayed increasing anxiety and fear around Lauren due to the cumulative effect of her behaviors and to the students' awareness of the inability of the teaching staff to protect them entirely.
 
 
 32
 The record contains little evidence that Lauren's aggressive behaviors have decreased in frequency or severity since her arrival at Parkway Central Middle School. Dr. Jones testified that Lauren's behavior had not changed over the previous two years.
 
 
 33
 The Lights argue that the district court's findings are clearly erroneous because Lauren's behaviors amounted to no more than a nuisance. The Lights stress that Lauren only once punctured Galownia's skin, that no medical treatment by a physician has been required, and that the police have never been called to restrain Lauren. In general, the Lights claim that the district court failed to employ an adequately specific and stringent definition of "injury." We disagree. As an initial matter, we emphatically reject the contention that an "injury" is inflicted only when blood is drawn or the emergency room visited. Bruises, bite marks, and poked eyes all constitute "injuries" in the context of this analysis. More broadly, we reject the proposition that a child must first inflict serious harm before that child can be deemed substantially likely to cause injury.
 
 
 34
 We affirm the district court's use of the Honig test and find no clear error in its findings of fact.
 
 
 35
 V. HAVE THE SCHOOL DISTRICTS TAKEN REASONABLE STEPS TO MINIMIZE LAUREN'S RISK OF CAUSING INJURY?
 
 
 36
 We find that the district court erred in its refusal to ascertain whether Parkway School District and the SSD have made reasonable efforts to accommodate Lauren's disabilities. As already noted, this inquiry should not be a wide-ranging review of all aspects of a student's educational program, but should focus on whether the school district has done all it reasonably can to minimize the risk of resulting injury through the use of "supplementary aids and services." See 20 U.S.C. Sec. 1412(5)(B). Based upon our independent review of the record, we conclude that the school districts have taken reasonable steps to minimize Lauren's propensity to cause injury. A fuller discussion of the school districts' efforts is contained in the factual summary above, and we need not repeat it here.
 
 
 37
 The Lights contend that Lauren would be less likely to cause injury if her teachers were better trained. They rely on the testimony of Mary Granville, the consultant retained by the SSD to facilitate Lauren's transition to Parkway Central Middle School. Granville testified that she "would expect" more training to result in "fewer ... incidents of biting and kicking...." Tr. 2147-48. Granville's testimony was contradicted by several witnesses, including Dr. Toni Strieker, the Area Coordinator for the SSD. Strieker gave her professional opinion that the assistance of inclusion facilitators, behavior management specialists, special education consultants, and crisis prevention trainers had produced no reduction in the frequency of Lauren's aggressive behaviors. We note that extensive training and support have already been provided. Lauren's teacher, Jane Galownia, and teacher's assistant, Lynn Wilson, have been appropriately certified by the State of Missouri. In addition, Galownia received specific training from Mary Granville at the beginning of the school year and consulted with her from time to time during the ensuing months. All of the teachers and staff in Lauren's classroom received training in crisis prevention and intervention, in behavior management strategies, and in inclusion practices. The SSD also provided periodic assistance from its staff of inclusion facilitators.
 
 
 38
 Based upon these uncontradicted facts, we conclude that the school districts took reasonable steps to train and prepare Lauren's teaching staff. The Lights have put forward no other alternative measures that they believe the school districts should reasonably be required to attempt.
 
 
 39
 In short, the school district has met its burden under both prongs of the two-part test we adopt today. The district court committed no clear error in finding that Lauren Light's placement at Parkway Central Middle School was substantially likely to result in injury, either to herself or to others. Moreover, we conclude that Parkway School District and the SSD made reasonable efforts to minimize the risk that Lauren would inflict injury. Thus, we hold that Lauren Light was properly removed by the district court from Parkway Central Middle School.
 
 VI. LAUREN'S INTERIM PLACEMENT
 
 40
 Finally, we are confronted with the issue of the proper interim placement for Lauren pending the resolution of the Lights' administrative challenge to the new long-term educational placement proposed by Lauren's IEP team. The parties apparently disagree about whether Lauren should be temporarily placed at the Neuwoehner School, a segregated facility for disabled children, or in a self-contained classroom for children with autism at the Brittany Woods School in a neighboring school district. Given the temporary nature of the interim placement and the safety concerns which motivate the removal, we believe that due deference should be accorded to the determination of the school district. We emphasize that the interim placement should be maintained only until Lauren's long-term placement is finalized through the IDEA's administrative review process. See 20 U.S.C. Sec. 1415.
 
 VII. CONCLUSION
 
 41
 We uphold the district court's finding that maintaining Lauren Light at Parkway Central Middle School is substantially likely to result in injury, either to Lauren or to others. Based upon our independent review of the record, we further find that Parkway School District and the SSD have made reasonable efforts, through the use of supplementary aids and services, to minimize the risk that Lauren will inflict injury at her current placement. We affirm the order of the district court that Lauren Light be removed from Parkway Central Middle School until such time as her long-term educational placement has been decided through the appropriate administrative channels.