896 F.Supp. 948 (1995)
CLINTON COUNTY R-III SCHOOL DISTRICT, Plaintiff,
v.
C.J.K. and I.J., a minor, by and through his Mother and Next Friend, C.J.K., Defendants.
No. 95-6098-CV-SJ-6.
United States District Court, W.D. Missouri, St. Joseph Division.
August 9, 1995.
*949 Cathy J. Dean, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for plaintiff.
Kevin Thompson, Jefferson City, MO, Michael H. Finkelstein, Jefferson City, MO, for defendants.

MEMORANDUM AND ORDER
SACHS, Senior District Judge.
Plaintiff school district seeks short-term relief from a statutory requirement that, pending administrative review of a proposed change of placement, a handicapped child shall remain in the educational setting last agreed to by the school authorities and a parent of the child. At issue is the so-called "stay put" provision of federal law. 20 U.S.C. § 1415(e)(3). The soundness of permanent educational placement is not before the court. The parties agreed to a delayed hearing, combining a motion for preliminary injunction with the request for injunctive relief during the administrative process and a declaration of rights.
The Supreme Court has authorized a very narrow judicial exception to the "stay put" requirement, where the school officials can establish that the current placement is "substantially likely to result in injury either to (the handicapped child) or to others." Honig v. Doe, 484 U.S. 305, 328, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988). In other words, no matter how disruptive or offensive the behavior of the child may be, and regardless of the effect of misbehavior on the school staff and the student body, there can be no change in placement until completion of administrative review, absent the substantial likelihood of personal injury.
Legislative protection of the education of handicapped children was a remedial action to stop a common but disgraceful practice of abandoning the education of handicapped children, or "warehousing" such children. Justice Brennan wrote eloquently on this subject in Honig. The "stay put" provision was intended, according to Honig, to prevent sudden unilateral transfers by school officials. Corrections in school placement were to be delayed until completion of an administrative review to assure "due process." Bouncing handicapped children back and forth is obviously undesirable. Judicial intervention during the period of administrative review is reserved for near-emergency situations, where personal injury is substantially likely to occur.[1]
The present case shows that, as in some other situations, considerable harm can occur as the unanticipated result of laws intended to be remedial. Statutory overkill is not infrequent, and this situation may qualify for that characterization.
The Supreme Court has not attempted to offer guidelines for application of its narrow exception to the "stay put" requirement. Property damage is apparently not enough to authorize relief. Disruption of the educational process apparently does not open the door for early relief. While the danger of personal injury is undefined, it seems that it must be of a distinctly significant nature, going well beyond what may be typical for even behaviorally disturbed students, before extraordinary relief is merited. Danger must not only be likely (very possible), but must be "substantially" likely. The Supreme Court's language is not unlike that of a statutory test for the involuntary commitment of persons *950 with a mental illness. See Matter of DeMatthew, 349 N.W.2d 855 (Minn.App.1984).
Counsel for the defendants, Issac Jackson and his mother, acknowledge in argument that a 50% chance of personal injury during the school year is not required before the court should find substantial likelihood of injury. He suggests, when pressed by the court, that one chance of injury out of three (33%) might be used as a guideline rule for school district relief. I shall assume, however, that a borderline case might be presented if there is something like a 5% danger of material personal injury or some appreciable danger of serious personal injury.[2] The present case is troublesome because I believe the danger is in the fairly debatable range.
If a 5% danger of a fire in the school would obviously be intolerable, or a 5% danger of asbestos exposure, what justification is there in saying the likelihood of injury must be "substantial," and treating 5% as the measure of substantiality? Congress presumably was aware that a significant, appreciably heightened risk of physical danger, like the elevated level of disruption and interference with discipline and educational progress of the class as a whole, would necessarily be the price that would be paid when there is "mainstreaming" of handicapped children with behavioral disorders as well as learning disabilities. Presumably long-term benefits were deemed to outweigh the short-term price  and of course the presumed immediate benefit of integration for the disadvantaged child would have been a factor.[3]
Some degree of danger is indicated by the following facts, developed during a three-day hearing: (1) there have been repeated threats by Issac to school officials and students, including (a) threatening a teacher to make her "black and blue" (P.Exh. 12), (b) threatening to place an explosive device in the principal's car (P.Exh. 81), and (c) warning a student that he knew where she lived (P.Exh. 38); (2) although Issac testified he never intended to carry out his threats of physical violence, he told a reporter during the hearing that he did not know whether he would resort to violence; (3) Issac has repeatedly, during the school year 1994-5, exploded in anger while at school, and has taken out his hostility by throwing and violently pushing furniture and other objects, including one incident in which he threw a chair in a manner that caused it to bounce off a wall and injure a child's ankle to the extent that she cried (P.Exh. 36); (4) the acknowledgement at the hearing that Issac did not intend to carry out his numerous threats of physical violence could possibly motivate him, as a matter of pride, to carry through with some threat during the coming school year; and (5) teachers have testified credibly that they observed Issac during his fits of fury, considered him totally out of control, and were physically afraid of him, although they felt it necessary to the performance of their duties to conceal such fright.
On the other hand there are relatively few recorded perceptions of physical danger, except for one or two conclusory remarks  presumably after consulting counsel and learning that the risk of personal injury was a critical issue (P.Exh. 46; D.Exh. 18, p. 1). I am left with the impression that physical danger was one of the lesser concerns regarding Issac's misbehavior, prior to this legal *951 confrontation. Moreover, a psychological evaluation prepared on March 22, 1995, after most of the problematic events in question, concludes that "[a]gressiveness and oppositionalism were not at all prominent in his deeper personality functioning" and that his misconduct is a "learned behavior, used in some capacity as coping mechanisms and environmental stressors."[4] P.Exh. 80, p. 5. Contrary to my speculation at trial, the explosive behavior may well be essentially confined to the school environment, occurring as a defense mechanism to shield learning disabilities.[5] Issac has said "if it wasn't for him getting in trouble with juvenile authorities" he would hit Dan Kennedy, the principal at the Middle School. P.Exh. 93, p. 1. His conduct has been largely consistent with this inhibition, which presumably is a continuing one. I conclude that Issac presents a danger of causing some material physical injury (intended or accidental) that may be five to ten times that of an average boy his age, but that such danger probably does not reach a 5% possibility during the coming school year. Further, it would be wholly speculative on the present record to anticipate serious personal injury.
No reported ruling by a court has a recitation of facts in which a school district even claimed a right to avoid the stay-put provision when the physical dangers were as limited as proven in this case. The leading Eighth Circuit case, Light v. Parkway C-2 School District, 41 F.3d 1223 (8th Cir.1994), has facts that are far more dramatic than in this case, including instances of actual intentional injury. For another example of what I believe to be a typical case authorizing immediate judicial relief, see Texas City Independent School Dist. v. Jorstad, 752 F.Supp. 231, 234-5 (S.D.Tex.1990). Apart from a few school-boy fights, in which Issac was not shown to have been the aggressor, the record, apart from threats, shows no more than an average propensity to actual violence against persons. In one instance a teacher felt she was about to be attacked when another student blocked Issac's approach to her, but it seems doubtful that a physical attack would otherwise have occurred. The unintended injury during the chair-throwing incident seems to be something of a fluke. With one exception, the EHLR (Education for the Handicapped Law Report) cases cited to me by the school district are substantially more persuasive that interim relief was authorized under Honig.[6]
I acknowledge regret that I cannot go beyond Honig to consider the total impact of Issac's remaining temporarily at the Middle School. The parties should seriously consider an agreed disposition of this case which would avoid the strong possibility of (1) another very bad year at the Middle School for all concerned and (2) a final administrative decision, supportable on appeal, for transfer of Issac.[7]
This ruling makes it unnecessary to definitively consider the second requirement imposed by Light, that the school district must demonstrate it took "reasonable steps to minimize" the risk of causing physical injury (in other words, that it is not itself largely responsible for causing the problem of which it complains). 41 F.3d at 1230. Considering the possibility of an appeal by the district and a reversal of my novel ruling on dangerousness, the appellate court would find it necessary either to remand or to consider itself (as in Light) the alternate issue of reasonable accommodation. The alternative method of disposing of this case may be *952 profitably discussed summarily, even though in dicta.
I doubt that affirmance of judgment for defendants could fairly rest on a failure of proof as to reasonable accommodation. On present information, and without the benefit of a more expert judgment that may be anticipated in the administrative proceedings, I would probably have ruled for the district on this issue.
Certainly there were arguable deficiencies in the handling of Issac's condition. The itinerant BD specialist did not convince me that she was very effective, either with Issac or with the teachers, although she may have been coping with a situation she could not greatly improve. Her written plan, however, prepared in February, is more impressive but not reassuring as to likely success. P.Exh. 59, 62. I was favorably impressed by Ms. Thomas, who seemed knowledgeable and caring, and for the most part on good terms with Issac. She also provided a place of refuge, which is about the only feasible solution suggested by defendants. The other teachers and the principal seemed generally sympathetic and about as effective as might be anticipated from mainstream teachers. Most members of the public and most parents would probably be critical of the program for being too permissive, whereas defendants criticize it as excessively punitive and confrontational.
Short of having the Smithville special school teacher, Ms. Hersh, in regular personal control of Issac's education (probably a wasteful use of a rare talent), I am doubtful that much more effective handling would have occurred.[8] And it may be noted that what may have been the most dangerous situation referred to at the hearing occurred while Issac was at Smithville (I refer to the threat that Issac would throw himself from an automobile, which had more "ring of truth" than other dangers referred to  P.Exh. 104).
Based on the failure to prove a level of danger required by the foregoing analysis, judgment will be entered in favor of defendants. SO ORDERED.
NOTES
[1] Judge Kozinski refers to the necessity of showing "an immediate threat" to personal safety. Clyde K. v. Puyallup School Dist. No. 3, 35 F.3d 1396, 1399 n. 3 (9th Cir.1994). This may some-what overstate the burden, but emphasizes the weight of the burden of proof on a school district seeking to free itself of the "stay put" provision of law.
[2] My suggestion that a 5% rule is about right, and would be consistent with the Honig requirement, may seem inadequate for the protection of handicapped children, from the standpoint of their advocates, and excessive to school authorities worrying about the physical safety of their personnel and the children in their keeping. Without statistical proof I make the commonsense assumption that all children pose some potential for danger to others (especially when, as in this case, they would be 13 years old and slightly larger than most of the teachers). I make the further unsupported assumption that the risk might be appraised at one chance in 200 that a child will cause material physical injury during the course of a school year. A 5% rule would mean that a child with a behavioral disorder must present at least ten times the danger of the average child before interim displacement of the child could be allowed by a court.
[3] I do not suggest that Issac's experience during the last school year at the Plattsburg Middle School was within the anticipated level of disruption and interference. Even his mother probably acknowledges that the experience was an intolerable burden for the district and probably harmful to him. But defendants tend to blame the school district rather than Issac's personality problem which they believe was manageable.
[4] Unfortunately there is no recommendation of record going beyond that internally prepared in February.
[5] Issac seems bright and quick in oral learning but has a serious disability in reading, writing and spelling.
[6] The exception, Bd. of Ed. v. Kurtz-Imig, 16 EHLR 17 (N.D.Ill.1989), is somewhat conclusory and was apparently weakly defended.
[7] I repeat the admonition of Judge Kozinski, changing only the name of the pupil, that Isaac's "experience offers a poignant reminder that everyone's interests are better served when parents and school officials resolve their differences through cooperation and compromise rather than litigation." Clyde K., supra, 35 F.3d at 1402. It may be added that defendants' attorneys should avoid the temptation to litigate in order to establish clearer rules, as in Light, or for the public relations needs of the legal group and the program, which seem to have been exploited here.
[8] A dramatic improvement in Issac's learning ability could be a turning-point, but there is no evidence showing this to be achievable.