**SCHOOL BOARD OF PINELLAS COUNTY, FLORIDA,**
**Plaintiff,**

v.

**J.M., a minor, by and through his natural guardian and next friend, L.M.,**
**Defendant.**

No. 97–590–CIV–T–23E.

United States District Court,
M.D. Florida,
Tampa Division.

April 4, 1997.

Otis O. Wragg, Robles & Gonzalez, P.A., Miami, FL, John W. Bowen, Pinellas County School Bd., Largo, FL, Charles L. Weatherly, The Weatherly Law Firm, Duluth, GA, for Plaintiff.

Mark S. Kamleiter, Law Office of Mark S. Kamleiter, St. Petersburg, FL, for Defendant.

## ORDER

McCOUN, United States Magistrate Judge.

THIS MATTER is before the court on **Plaintiff's Motion for Temporary Restraining Order** (Doc. 2) and **Plaintiff's Motion for Preliminary Injunction** (Doc. 3). The parties having recently consented to the magistrate judge and there being no order on the Motion for TRO, it is deemed merged with the Motion for Preliminary Injunction. A hearing was conducted March 25, 1997. Each side presented a number of witnesses in addition to affidavits previously filed with this court. Defendant also presented a brief in opposition. (Doc. 9).

Plaintiff, the School Board of Pinellas County, Florida (hereinafter "School Board"), has sued J.M., a minor, by and through his natural guardian and mother,

L.M., for an injunction pursuant to provisions of the Individuals With Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (hereinafter "IDEA"). In February, 1997, the School Board proposed a change in J.M.'s educational placement, along with a new Individualized Education Program (hereinafter "IEP"). By the terms of the new IEP, J.M. would be removed from his special education class at Osceola Middle School and placed at the Paul B. Stephens Exceptional Education Center (hereinafter "Stephens Center"). The Defendant has objected to the proposed change in placement and has requested an administrative due process hearing under the provisions of the IDEA. Pursuant to 20 U.S.C. § 1415(e)(3), the School Board is prevented from unilaterally moving J.M. until the completion of the administrative hearing and judicial review. For this reason, the School Board now seeks an injunction enjoining the enforcement of this "stay-put" provision of the IDEA for a term of forty-five days so that J.M. may be transferred to the Stephens Center. In addition to an injunction, the School Board seeks an order of this court directing J.M.'s placement at the Stephens Center.

## I.

J.M. is a twelve year old student presently attending special education classes at Osceola Middle School in Pinellas County, Florida. J.M. suffers from autism and he is a handicapped child within the meaning of the IDEA. Prior to the start of the 1996/97 school year, J.M. was receiving his schooling at the Stephens Center. Because of the progress he made at the Stephens Center and because his mother wished him to advance to the special education program for autistic students at Osceola Middle School, a change in his placement was made at the start of the school year.

In approximately mid-September, 1996, J.M. began attending the special education class at Osceola Middle School. This class is composed of seven students, all autistic. His teacher, Terri Ossenberg, is assisted by two teacher assistants. J.M. has evidenced some behavioral problems from the outset. In her affidavit in support of the Motions, Ms. Ossenberg recounts that she has kept a daily log of J.M.'s behavioral activities which reflects approximately forty-three instances of aggressive behavior by J.M. These incidents range from minor to more serious conduct and are generally categorized as hitting, kicking, spitting, pulling hair, and throwing objects. She also recounts several instances of what is labeled "sexual touching." Additionally, Ms. Ossenberg testifies that on nine occasions, J.M. has hit staff members. She outlines numerous efforts made in an effort to accommodate J.M. (*See* Plaintiff's Exhibit 4). She acknowledges that the frequency of the inappropriate conduct has decreased over the course of time since the start of school. However, as recently as March 14, 1997, J.M. hit another teacher. The hitting is described generally as slapping. For instance, Ms. Ossenberg has been slapped on the arm on a couple of occasions; another teacher, Ms. Shaper, was slapped on the side of her face; and another assistant was slapped in the chest. While no one has been seriously injured, the force of the slaps is sufficient enough to leave marks. No students have been hit and J.M. has not injured himself.[1] As for the "sexual touching," J.M. has, on two occasions, touched Ms. Ossenberg's breasts and on other occasions he has touched her bottom and has touched her in the crotch area. These occurrences are un-

---

1. The progression of behavior that led to the proposed change in placement can generally be described as follows: when J.M. was placed at Osceola Middle School in September, 1996, he had a number of initial incidents of inappropriate behavior. Early on, he was prone to pulling the teacher's hair. After awhile, this conduct subsided. However, in November, 1996, J.M. struck an assistant in the chest. This incident prompted an effort by the School Board to expel J.M. Instead, he was suspended for several days. Thereafter, with the assistance of counsel, J.M.'s mother and members of the School Board drafted a behavioral management plan for J.M. This plan was finalized in December, 1996. More hittings occurred in December. In January, 1997, J.M. had a couple of spitting incidents, prompting another meeting between counsel, J.M.'s mother, and school officials. While the school officials did not mention their intentions, the following week, the School Board issued a letter notifying J.M. of the intended change of placement. In March, 1997, J.M. struck Ms. Shaper.

predictable, but occur with some regularity. Ms. Ossenberg evidences some fear of J.M.

The School Board has retained the services of Dr. B.J. Freeman, a professor in the Department of Medical Psychology at U.C.L.A. Dr. Freeman's expertise is in the area of autistic children. She has travelled to Pinellas County for purposes of meeting with J.M. and assessing the circumstances of this case. As part of her review, she conducted tests on J.M. Although J.M. is twelve years old, his test scores fall within a range from three years old to five years and three months old. In Dr. Freeman's view, J.M. is moderately retarded in addition to being autistic. His scores reflect his particularly low social adaptive skills and emotional skills. Additionally, Dr. Freeman has reviewed school records, spoken with past teachers, J.M.'s mother, and J.M. Dr. Freeman expresses her opinion that there is a significant risk of harm to others and to J.M. if he remains in his current placement at Osceola Middle School. According to Dr. Freeman, the teachers there have made a reasonable effort to address J.M.'s behavior. While his behavior has improved, there is still the potential for J.M. striking out in an unpredictable manner and perhaps hurting someone else.[2] According to Dr. Freeman, the "sexual touching" is not sexual behavior at all, but is instead negative attention seeking conduct which J.M. has learned is likely to get a reaction. Dr. Freeman describes his current placement as unsuccessful and not likely to become successful because J.M. is not yet developed enough in some areas to allow for his appropriate behavior.

In conclusion, Dr. Freeman opines that the appropriate program for J.M. is to return him to the Stephens Center so that additional progress can be made at controlling his inappropriate behavior and teaching him skills which will allow him to function appropriately in a middle school setting. She views him as a threat to cause injury if he remains at Osceola.

Pam Harshbarger, the Compliance Supervisor for Exceptional Student Education, testified that it is the School Board's desire to return J.M. to the Stephens Center because of his inappropriate aggressive behavior and because the Stephens Center is better equipped to address behavioral and developmental problems of students such as J.M. The Stephens Center serves approximately 230 handicapped children. It employs approximately 40 teachers and 50 to 60 teacher assistants. There is also an occupational therapist, a physical therapist, nurses, social workers, and guidance counselors on staff. In spite of the availability of these services, clearly the Stephens Center is a more restrictive environment than the placement at Osceola.

One of the teachers on staff at the Stephens Center, Robert Cormier, testified. J.M. is a former student of his at the Stephens Center. According to Cormier, J.M. evidenced some aggression to staff and students while a student there. Although J.M. made behavioral progress and progress in his class function, this witness did not agree to J.M.'s transfer to Osceola Middle School because he was not ready for this environment. This witness is also of the opinion that there is a potential for J.M. to strike out at a teacher or others.

Another teacher, Ms. Shaper testified that J.M. has twice tried to hit her in the face. One time he was successful and struck her on the cheek. She has not seen J.M. hurt any other children or himself, although she believes that he has the potential to hurt him-

---

2. According to Dr. Freeman, aggression is not necessarily a characteristic of an autistic child. In J.M.'s case, she suggests that his aggressive behavior has developed over a number of years. Over time, he has learned that his conduct causes a reaction and the reaction reinforces the action. She also opines that J.M.'s aggression is, in part, a product of his frustration. This suggests a difficult cycle to break. While his trained teachers use avoidance and ignore inappropriate conduct so as not to reinforce it, it is difficult to do this in the face of the more aggressive contacts by J.M. While part of the plan in placing J.M. at Osceola Middle School was to allow greater interplay with other students, because of J.M.'s problems, he has effectively become more isolated from his developmental peers. Due to the one-on-one teaching, which is necessary, he has become a classroom unto himself and the intended benefits of this new school setting are wholly defeated.

self through some of his conduct, such as climbing on his desk.

All of the School Board witnesses express the view that J.M. would be better served if he were at the Stephens Center.

L.M., J.M.'s mother, and Ms. Laurene Sagnella testified on J.M.'s behalf. Ms. Sagnella is a high school teacher of autistic children at the Stephens Center and has worked with autistic children for twelve years. She is intimately familiar with J.M., having provided respite care for J.M. for up to ten days at a time to allow his parents time off. She is positive in her descriptions of J.M.'s behavior and she in no way finds him to be a dangerous individual.

L.M., J.M.'s mother, evidences sincere concerns for her child's well being. She testified to her frustration with the current situation. In her view, after making considerable improvement at the Stephens Center, her son was ready for another environment. She requested that her son be placed into a regular school so that continued progress could be made toward her goal of J.M. developing into an independent human being. She acknowledges his behavioral difficulties upon his placement at Osceola Middle School, but she seems to suggest that school officials have themselves frustrated J.M.'s progress from the outset. She desperately wishes for J.M. to remain at Osceola Middle School for the remaining nine weeks of school. She suggests that this summer, the family is moving to Texas. In her view, her son is not a danger and his inappropriate behavior can be controlled.

The Defendant's expert, Ms. Teresa Rogers, also has experience with autistic and otherwise handicapped children. She has spent some time with J.M. at school and at home. She was thwarted in her efforts at gaining some information and with speaking with school officials, who advised her they were not allowed to answer any questions.[3] This witness observed no aggressive behavior toward teachers or students. The witness is critical of the School Board's failure to do a functional analysis of J.M.'s behavior before preparing his behavior plan, and she is critical of the plan itself. In this witness's opinion, the teachers have gotten J.M. under control and with a little alteration of his plan, they could get better control over him. She does not believe that he is a danger to himself or others or that the present staff has done all that it can and she does not recommend a change in his placement.

## II.

Before assessing the appropriateness of the preliminary injunction in these circumstances, some discussion of the pertinent aspects of the IDEA is appropriate. A concise statement of those pertinent considerations is found in *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). There, the Court stated,

> As a condition of federal financial assistance, the Education of the Handicapped Act requires States to ensure a 'free appropriate public education' for all disabled children within their jurisdictions. In aid of this goal, the Act establishes a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children and to provide administrative and judicial review of any decisions with which those parents disagree. Among the safeguards is the so called 'stay-put' provision, which directs that a disabled child 'shall remain in [his or her] then current educational placement' pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree. 20 U.S.C. § 1415(e)(3) [20 U.S.C.S. § 1415(e)(3) ].

*Id.* at 308, 108 S.Ct. at 596. The EHA, now called the IDEA, creates both procedural safeguards and substantive rights for the handicapped. In addition to the right to a free and public education, the Act is intended to assure individualized attention to the needs of the handicapped child. Such children have the right to an education in the

---

**3.** In this court's view, it is short sighted and inappropriate to deprive such a witness from all relevant information. In the future course of this litigation, the School Board shall refrain from any such conduct that deprives anyone, including the court, of all relevant information.

least restrictive setting, and to the maximum extent possible, they must be "mainstreamed" with nonhandicapped students. *Id.* The individualized educational program mandated for each student and the requirement of parental involvement are central to the successful operation of the statute. The "stay-put" provision at issue here is critical to its enforcement.

In *Honig,* while finding no exception to the clear language of the "stay-put" provision, the Court nevertheless found authority for a school board to seek relief "... in those cases in which the parents of a truly dangerous child adamantly refuse to permit any change in the placement...." *Id.* at 325, 108 S.Ct. at 606. The authority for such relief, which includes injunctive relief, is found at § 1415(e)(2), as well as in the equitable powers of the Court. *Id.* at 327, 108 S.Ct. at 606.

> In short, then, we believe that school officials are entitled to seek injunctive relief under § 1415(e)(2) in appropriate cases. In any such action, § 1415(e)(3) effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others.

*Id.* at 328, 108 S.Ct. at 606.

Even prior to the decision in *Honig,* several courts had found a judicial exception to the "stay-put" provision in circumstances where the student's present placement endangered himself or others or threatened to disrupt school safety. *Jackson v. Franklin County School Board,* 765 F.2d 535 (5th Cir.1985); *Victoria L. by Carol A. v. District School Board of Lee County, Florida,* 741 F.2d 369, 374 (11th Cir.1984).

In *Light v. Parkway C–2 School District,* 41 F.3d 1223 (8th Cir.1994), a case cited by both parties, the court addressed the necessary showing to support a change of placement of a dangerous student. In addition to establishing the substantial likelihood of injury element, the Eight Circuit also required a showing that the school board had "... done all that it reasonably can to reduce the risk

that the child will cause injury." *Id.* at 1228. In other words, that the school board, consistent with the IDEA, had made all reasonable efforts to accommodate the student's disabilities.

It is against this backdrop that the court must evaluate the Pinellas County School Board's right to enjoin enforcement of the "stay-put" provision.

### III.

Motions for preliminary injunction are governed by the provisions of Fed.R.Civ.P. 65 and this court's local rules. Case law in this circuit establishes clear standards governing the issuance of either a temporary restraining order or a preliminary injunction. A preliminary injunction may be issued when necessary, "to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Authority of the State of Florida, et al. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). This circuit requires consideration of four factors in determining whether to grant a preliminary injunction pursuant to Rule 65 of the Fed.R.Civ.P.

> The four prerequisites are 1) a substantial likelihood that the movant will prevail on the merits; 2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; 3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the opponent; and 4) that granting the preliminary injunction will not disserve the public interest.

*West Point–Pepperell, Inc. v. Donovan,* 689 F.2d 950, 956 (11th Cir.1982); *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983). · A preliminary injunction is an extraordinary remedy and the Plaintiff bears the burden of clearly establishing each of the four elements. *Cafe 207, Inc. v. St. Johns County,* 989 F.2d 1136, 1137 (11th Cir.1993).

Here, Plaintiff asserts that the injunction is pursuant to the authority of *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) and not Rule 65, Fed.R.Civ.P. Arguably, under the standard announced in

*Honig,* the four part analysis required in this circuit for such equitable relief is inapplicable. However, this court can find no decision in this circuit addressing the matter. Absent circuit precedent to the contrary, this court finds it appropriate to apply the four factor test in arriving at its conclusion. A preliminary injunction, whatever its source, is an extraordinary remedy. In recognition of that fact, this circuit requires consideration of the merits of the matter, and the countervailing harms such relief may cause to the parties or the public. Such an approach is not inconsistent with the standard set out in *Honig* and is entirely consistent with the goals of the IDEA insofar as it seeks to assure procedural safeguards for the handicapped students. These safeguards, applicable to all handicapped students, require the court to apply a balanced consideration of the requirements of the student's rights under the IDEA and the rights of the school board in maintaining a safe environment for all students. *See Honig,* 484 U.S. at 327, 108 S.Ct. at 606.

### A.

In considering whether the movant is substantially likely to prevail on the merits, at issue is the merits of the School Board's claim that J.M. is a dangerous child in the sense that he is substantially likely to injure himself or others if he remains in his current placement. Upon the record before the court, it concludes that the School Board is likely to succeed on this issue.

 While this court declines to label J.M. as a dangerous child, the record supports that he is substantially likely to injure others if he is left in his current placement. The record suggests that J.M.'s placement at Osceola Middle, while well intended, was premature. From the outset of this placement, J.M. has evidenced behavioral difficulties. The more serious problems manifest themselves in ways which are potentially injurious to others. These are matters beyond J.M.'s ability to control. He simply has not yet developed the behavioral skills to allow for more appropriate behavior in this setting.

While it is true that no one has, as yet, been seriously injured, that is not the yardstick by which this issue is to be measured. *Light* 41 F.3d at 1229. At twelve years of age and one hundred thirty pounds, J.M. has hit his teachers with sufficient force to leave marks on these larger individuals. Such results are injurious to the staff within the meaning of *Honig.* The touching of his teacher's breasts, bottom, and crotch area are also injurious even if not intended as sexual touching.

Although the frequency of J.M.'s inappropriate behavior has declined, he continues to hit and offensively touch teachers. While this behavior is somewhat unpredictable, this court must conclude from the record that it will continue if J.M. remains in his current placement and that it is substantially likely to injure another.

### B.

 As to the prerequisite of irreparable harm to the movant, this issue must be decided in the context of the School Board's need to provide a safe learning environment to all participants. While it is arguable that the class, teachers, and staff at Osceola Middle might well survive J.M. for the balance of the school year, it would be at the expense of his continued hitting and inappropriate behavior which, even in its milder forms, is disruptive to the learning environment and therefore injurious to the other students. The School Board's obligations under the IDEA are equally applicable to the other autistic children in J.M.'s class.

### C.

 This court also concludes that the threatened injury to the movant outweighs the harm to J.M. caused by an injunction against enforcement of the "stay-put" provision. J.M. will not be denied an education if enforcement of the "stay-put" provision is enjoined. While there is some "harm" in the context of the IDEA in changing a student to a more restrictive environment, such harm is minimized when the change of placement is appropriate to the circumstances. Upon the basis of the record before the court, it cannot conclude that a change of placement to a facility such as the Stephens Center is either

inappropriate or likely to harm J.M. Indeed, the evidence suggests the contrary.[4]

## D.

■ Finally, entering an injunction will not disserve a public purpose. In the larger picture, there is a benefit to the other students and staff at Osceola Middle that is in the public interest in these matters. As stated above, J.M. will still receive a free public education in a setting where hopefully he will continue to develop in ways that will allow him to progress into a mainstream setting in the future. This, too, is in the public interest.

## IV.

Accordingly, **Plaintiff's Motion for Preliminary Injunction** (Doc. 3) is **GRANTED** to the extent that the court hereby enjoins enforcement of the "stay-put" provision of 20 U.S.C. § 1415(e)(3) for a period of forty-five (45) days or until such period of time as Defendants have completed their administrative due process proceedings, including judicial review thereof, whichever term is shorter. In all other respects, the Motion for Preliminary Injunction is **DENIED.**

---

4. This court does not intend this comment as an indication that it is directing any particular placement. Although the School Board requests an order directing J.M.'s placement, this court finds no authority under *Honig* to direct any particular placement.