## STATE OF CONNECTICUT *v.*
## CHRISTOPHER SEEKINS
## (SC 18467)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 15—officially released December 7, 2010

*Richard C. Marquette*, special public defender, for the appellant (defendant).

*Raheem L. Mullins*, assistant state's attorney, with whom were *Cynthia J. Palermo-Murchison*, assistant state's attorney, and, on the brief, *David Shepack*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Under General Statutes § 54-56d (k) (2),[1] a criminal defendant who has been found incompetent

[1] General Statutes § 54-56d (k) (2) provides: "If the court finds that the defendant will not attain competency within the remainder of the period

to stand trial may be medicated involuntarily for the purpose of rendering him competent to stand trial if the trial court finds by clear and convincing evidence that, inter alia, "the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination." The defendant, Christopher Seekins, appeals[2] from the decision of the trial court ordering that he be medicated pursuant to § 54-56d (k) (2). The defendant claims that, because the crimes with which he has been charged are nonviolent offenses involving the recreational use of marijuana, as opposed to the sale and distribution of that drug, the trial court improperly concluded that the state's interest in determining his guilt or innocence outweighs his right to refuse the administration of medication. We reject this claim and, accordingly, affirm the decision of the trial court.[3]

---

covered by the placement order absent administration of psychiatric medication for which the defendant is unwilling or unable to provide consent, and after any hearing held pursuant to subdivision (3) of this subsection, the court may order the involuntary medication of the defendant if the court finds by clear and convincing evidence that: (A) To a reasonable degree of medical certainty, involuntary medication of the defendant will render the defendant competent to stand trial, (B) an adjudication of guilt or innocence cannot be had using less intrusive means, (C) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests, (D) the proposed drug regimen will not cause an unnecessary risk to the defendant's health, and (E) the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination."

Although § 54-56d was amended in 2009 and 2010; see Public Acts 2010, No. 10-28, § 1; Public Acts 2009, No. 09-79, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 54-56d throughout this opinion unless otherwise noted.

[2] The defendant appealed to the Appellate Court from the decision of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] For the first time on appeal, the defendant claims that the trial court's order of involuntary medication violates his right to freedom of religion

The record reveals the following facts and procedural history. On June 30, 2006, the defendant pleaded guilty to production or preparation of a controlled substance without a license in violation of General Statutes (Rev. to 2005) § 21a-246. The trial court sentenced the defendant to two years incarceration, execution suspended, and three years of probation. On or about September 18, 2007, during an unannounced visit to the defendant's home with the defendant's probation officer, officers from the Torrington police department discovered approximately 1.8 pounds of marijuana in the defendant's refrigerator,[4] fifty marijuana plants, a digital scale, growing lights, pots, fertilizer and soil. The defen-

under the first and fourteenth amendments to the United States constitution and the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, codified as amended at 42 U.S.C. § 2000bb et seq. (2006), because, according to the defendant, his refusal to take medication is "partly based [on] his deeply felt religious beliefs" as a member of the THC Ministry, a religion that practices the "[s]acramental use of cannabis . . . ." Because the defendant did not raise either of these claims in the trial court, however, the record is devoid of any evidence concerning his purported religious beliefs or affiliations. In the absence of an adequate record, we decline to review the defendant's constitutional and statutory claims implicating his right to religious freedom. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006) (reviewing court will consider unpreserved constitutional claim raised by defendant for first time on appeal only if trial court record pertaining to claim is adequate for appellate review), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007); *Janusauskas* v. *Fichman*, 264 Conn. 796, 807, 826 A.2d 1066 (2003) (this court generally will not review nonconstitutional claims raised for first time on appeal).

[4] At oral argument before this court, defense counsel noted that, according to the operative police report, the police seized 1.8 pounds of marijuana from the defendant's refrigerator. At all times relevant to the competency proceedings and in its brief to this court, however, the state has maintained that the police seized 8.4 pounds of marijuana from the defendant's refrigerator. At oral argument before this court, the state acknowledged the discrepancy between the police report and its position concerning the amount of marijuana that the police had seized from the defendant's refrigerator. The state indicated at that time that it was not prepared to concede that only 1.8 pounds of marijuana, rather than 8.4 pounds, had been seized from the defendant's refrigerator. Moreover, at no time prior to our release of this decision on December 7, 2010, did the state advise this court of any material change in its position with respect to the amount of marijuana seized or with respect to whether it intended to reduce or drop any of the charges pending against the defendant in light of the police report. Consequently, in our decision released on December 7, 2010, we referred to the seizure of 8.4 pounds of marijuana from the defendant's refrigerator. Subsequent to the release of this decision, however, the state filed a motion to correct, acknowledging for the first time that the police did, in fact, seize only 1.8 pounds of marijuana from the defendant's refrigerator. We granted the state's

dant was arrested and charged with the following offenses: (1) possession of drug paraphernalia within 1500 feet of a school by a person who is not enrolled in such school as a student in violation of General Statutes § 21a-267 (c), which carries a maximum sentence of one year imprisonment; (2) possession of four ounces or more of marijuana in violation of General Statutes § 21a-279 (b), which carries a maximum sentence of five years imprisonment for the first offense; (3) possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b), which carries a maximum sentence of seven years imprisonment for the first offense; (4) possession of four ounces or more of marijuana within 1500 feet of a school by a person who is not enrolled in such school as a student in violation of § 21a-279 (d), which carries a mandatory, nonsuspendable sentence of two years imprisonment that is to be served consecutively to the sentence imposed in connection with the underlying conviction under § 21a-279 (a), (b) or (c); (5) production or preparation of a controlled substance without a license in violation of General Statutes (Rev. to 2007) § 21a-246 (a), which carries a maximum sentence of ten years imprisonment for a second or subsequent offense;[5] (6) sale of one kilogram or more of marijuana in violation of General Statutes § 21a-278 (b), which carries a mandatory minimum sentence of five years imprisonment and a maximum sentence of twenty years imprisonment for the first offense;[6] and (7) violation of probation; see

motion, and, consequently, the corrected decision refers to the seizure of 1.8 pounds of marijuana from the defendant's refrigerator. The state contends, and we agree, that the correction with respect to the quantity of marijuana found in the defendant's refrigerator does not affect our analysis in this case.

[5] The defendant faces a maximum sentence of ten years imprisonment for a violation of § 21a-246 (a) because he previously has been convicted of that offense. See General Statutes § 21a-255 (b).

[6] Under § 21a-278 (b), the execution of the mandatory minimum sentence imposed thereunder shall not be suspended unless, at the time the offense was committed, the defendant was under eighteen years old or the defendant's mental capacity was significantly impaired, but not so impaired as to constitute a defense to prosecution.

General Statutes § 53a-32; which, in the present case, carries a maximum sentence of two years imprisonment.

A pretrial hearing was held on September 3, 2008, at which time the state moved for a competency hearing pursuant to § 54-56d (c).[7] At that time, the assistant state's attorney informed the trial court that, in addition to the charges pending in the present case, the defendant also had a charge of harassment in the second degree[8] pending in the judicial district of New Haven at Meriden. In the Meriden case, the trial court found the defendant incompetent to stand trial and committed him to the custody of Connecticut Valley Hospital, Whiting Forensic Division (Whiting), for restoration of competency. During his commitment, however, the defendant refused to take psychotropic medication as prescribed by his treating physicians, and the trial court in the Meriden case subsequently determined that it would be inappropriate to medicate him forcibly in view of the relatively minor nature of the crime with which he had been charged. On the basis of the defendant's psychiatric history in the Meriden case, the trial court in the present case granted the state's motion for a competency evaluation, and the defendant subsequently was evaluated by a clinical team at the New Haven community correctional center, where the defendant was being detained.

On September 23, 2008, the trial court conducted a hearing to ascertain the results of the competency evaluation. Bruce Knox, a licensed clinical social worker and member of the clinical team that had evalu-

[7] General Statutes § 54-56d (c) provides: "If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

[8] Harassment in the second degree carries a maximum sentence of three months imprisonment. See General Statutes §§ 53a-183 (d) and 53a-36.

ated the defendant, testified that it was the unanimous opinion of that team that the defendant was incompetent to stand trial. According to the team's evaluation report, which was admitted into evidence without objection, the defendant suffered from bipolar disorder, was "pervasively delusional," and was incapable of understanding the proceedings against him. Knox testified, however, that, with appropriate treatment, a "substantial probability" existed that the defendant could be restored to competency within sixty days through inpatient psychiatric hospitalization that included the administration of psychotropic medication. Knox further testified that the defendant previously had been restored to competency very quickly using standard medication for bipolar disorder and, further, that the medication likely would prove effective again in treating the defendant's symptoms. Knox confirmed the assistant state's attorney's report to the court, however, that the defendant had refused to take any medication during his most recent admission to Whiting.

On cross-examination, defense counsel asked Knox whether there were any health risks associated with psychotropic medication. Knox responded that "there's always some potential risk with any medication, but the treatment team at Whiting is familiar with the defendant. They've known him for many months, and I'm sure they would monitor any medication very closely, given [the defendant's] . . . concerns about [the] matter." The trial court then asked Knox whether, when the defendant previously had been restored to competency, he had suffered any adverse side effects from the medication. Knox responded that, as far as he knew, the defendant had suffered no such side effects.

After Knox completed his testimony, the trial court found the defendant incompetent to stand trial. The court further found, however, that the defendant could be restored to competency within sixty days through

inpatient treatment at Whiting if that treatment included the administration of psychotropic medication. The court then inquired of defense counsel as to whether the defendant would be willing to take such medication. Defense counsel responded that the defendant would be willing to take medication as long as it was not detrimental to his health. The trial court observed that the defendant previously had been restored to competency through the use of standard bipolar medication and inquired of defense counsel whether the defendant had experienced any adverse side effects from that medication. The defendant himself interjected that he had not experienced any side effects during the restoration period but that, later, he had experienced several side effects that he believed were adverse to his health. Specifically, the defendant stated that his veins turned purple, his hands shook, he saw bright auras around every light and periodically lost his balance. After the defendant finished speaking, defense counsel informed the court that the defendant also believed that the side effects he had experienced may have been attributable to the dosage of the medication that he had received. In light of the defendant's representation that he would be willing to take medication on the condition that it was not harmful to him, the trial court committed the defendant to the custody of Whiting for a period not to exceed sixty days for the purpose of restoring him to competency. The court observed, however, that, if at any point during that period the defendant refused to take his medication, the parties were to return to court to consider other options.

A second competency hearing was held on November 18, 2008, at which Susan McKinley, a licensed clinical social worker, testified. McKinley informed the court that she and a clinical team from Whiting recently had evaluated the defendant for competency to stand trial and had found him to be incompetent. McKinley testi-

fied that, although the defendant understood the charges against him and the general workings of the judicial system, he was unable to assist in his defense because "his persecutory and delusional [thinking] interfere[d] with his ability to think logically and rationally about the proceedings . . . [to] [c]onsider advice from counsel . . . [and to] [m]ake reasonable decisions about his case." McKinley explained that, since his commitment to Whiting on September 23, 2008, the defendant had refused to take any "synthetic" medications, insisting on "organic remedies" only, which were not available at Whiting. According to McKinley, the members of the evaluation team agreed unanimously that the defendant could be restored to competency within sixty days if he were to be medicated involuntarily. When the trial court asked McKinley if any less intrusive means were available to restore the defendant's competency, she responded that all less intrusive means already had been attempted but had failed. McKinley added, however, that she and the evaluation team believed that medicating the defendant involuntarily would not only restore him to competency but likely would benefit him by improving his mental health generally, as well.

At the conclusion of the evidentiary portion of the hearing, the trial court found the defendant incompetent to stand trial. The trial court then noted that, because the state was seeking an order of involuntary medication, the state bore the burden of establishing by clear and convincing evidence that the charges against the defendant were sufficiently serious to justify such an intrusion on the defendant's liberty. The assistant state's attorney responded that the state had a substantial interest in restoring the defendant to competency in view of the serious nature of the numerous drug felonies with which he had been charged and the fact that the defendant was a repeat offender. At the

conclusion of the assistant state's attorney's argument, the trial court found that the charges against the defendant were serious and that the state had an overriding interest in restoring him to competency. The trial court further found that, to a reasonable degree of medical certainty, involuntary medication would render the defendant competent to stand trial and that no less intrusive means existed for doing so. In light of these findings, the trial court appointed Betsy Graziano, a licensed clinical social worker, as the defendant's health care guardian to represent the defendant's best interests in accordance with § 54-56d (k) (3) (A).[9]

On December 24, 2008, after reviewing the defendant's medical and psychiatric records and meeting with the defendant on two occasions, Graziano filed a report with the court in which she concluded that it was in the defendant's best medical interest to receive a therapeutic dose of antipsychotic medication and mood stabilizer, involuntarily, if necessary. Graziano noted that she had consulted with John Dubozcy, the defen-

[9] General Statutes § 54-56d (k) (3) (A) provides: "If the court finds that the defendant is unwilling or unable to provide consent for the administration of psychiatric medication, and prior to deciding whether to order the involuntary medication of the defendant under subdivision (2) of this subsection, the court shall appoint a health care guardian who shall be a licensed health care provider with specialized training in the treatment of persons with psychiatric disabilities to represent the health care interests of the defendant before the court. Notwithstanding the provisions of section 52-146e, such health care guardian shall have access to the psychiatric records of the defendant. Such health care guardian shall file a report with the court not later than thirty days after his or her appointment. The report shall set forth such health care guardian's findings and recommendations concerning the administration of psychiatric medication to the defendant, including the risks and benefits of such medication, the likelihood and seriousness of any adverse side effects and the prognosis with and without such medication. The court shall hold a hearing on the matter not later than ten days after receipt of such health care guardian's report and shall, in deciding whether to order the involuntary medication of the defendant, take into account such health care guardian's opinion concerning the health care interests of the defendant."

dant's treating psychiatrist, among others, and that he had informed her that all possible, less intrusive means for restoring the defendant to competency had been attempted and had failed. With respect to the appropriate medication, Dubozcy recommended that the defendant be administered "a therapeutic dose of Risperdal and lithium . . . ." If the defendant were to refuse that medication, which is administered orally, Dubozcy then would prescribe a single, five milligram dose of Haldol, which would be administered intramuscularly. Graziano noted that the defendant's symptoms successfully had been treated with Risperdal and lithium on prior occasions with minimal side effects. Graziano further noted that, although a variety of side effects can occur with the administration of psychotropic medication, they generally are associated with long-term use and a failure to monitor a patient's vital signs and symptoms. Graziano then explained that Dubozcy had assured her that Whiting has sufficient staff to monitor the defendant around the clock, seven days a week, for any possible side effects, and that the staff would intervene appropriately should any adverse effects be detected.

A hearing on Graziano's report was conducted on January 5, 2009, at which she testified regarding her findings and recommendations. At the conclusion of the hearing, the trial court found, to a reasonable degree of medical certainty, that involuntary medication would "render the defendant competent to stand trial," an adjudication of his guilt or innocence could not be accomplished using less intrusive means, the proposed treatment plan was "narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests," and the proposed drug regimen would not cause any "unnecessary risk to the defendant's health" in view of the fact that the defendant would be closely monitored for side effects by his clinical team. The trial court

further found that the charges against the defendant were sufficiently serious to justify the state's intrusion on the defendant's liberty interests. In light of its findings, the trial court remanded the defendant to the custody of Whiting for an additional sixty days and ordered that he be medicated involuntarily for the purpose of restoring him to competency. In doing so, the trial court emphasized that it had considered the defendant's concerns regarding possible adverse side effects to the medication and that its order was predicated on the understanding that the defendant would be monitored closely for any such side effects.

The defendant subsequently filed an interlocutory appeal from the trial court's decision.[10] Thereafter, the trial court granted the defendant's motion to stay the order of involuntary medication pending the outcome of his appeal. We transferred the defendant's appeal from the Appellate Court to this court. See footnote 2 of this opinion.

On appeal, the defendant challenges only the trial court's finding under § 54-56d (k) (2) that the crimes with which he is charged are serious and, therefore, that the state's interest in trying him overrides his right to be free from unwanted medication. The defendant does not challenge the trial court's other findings under § 54-56d (k) (2), namely, that involuntary medication will render him competent to stand trial, an adjudication of his guilt or innocence cannot be accomplished using less intrusive means, the proposed treatment plan is narrowly tailored to minimize the intrusion on his liberty and privacy interests, and the proposed drug regimen will cause no unnecessary risk to his health. The defendant also does not challenge § 54-56d (k) (2) on

---

[10] As this court previously has determined, an order directing that a defendant be forcibly medicated under § 54-56d is an appealable final judgment for purposes of General Statutes § 52-263; see *State* v. *Garcia*, 233 Conn. 44, 66, 658 A.2d 947 (1995); and the state does not contend otherwise.

constitutional grounds or contend that the trial court failed to apply the proper standard for determining when an order of involuntary medication constitution- ally is permitted for the purpose of rendering a person competent to stand trial.[11] The defendant's sole claim, rather, is that, because the crimes with which he has been charged are all nonviolent offenses involving the recreational use of marijuana, the trial court improperly concluded that the state's interest in trying him overrides his right to self-determination.

The following legal principles guide our analysis of this claim. It is well established that "[a]n individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome. *Sell* [v. *United States*, 539 U.S. 166, 178–79, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003)] (quoting *Riggins* v. *Nevada*, 504 U.S. 127, 134, 135, 112 S. Ct. 1810, 118 L. Ed. 2d 479 [1992]). This is because [t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington* v. *Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). Indeed, it has been observed that when the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense. [Id., 237–38] (Stevens, J., dissenting).

"At the same time, the government has a significant interest in bringing a person accused of a serious crime to trial. See *Sell* [v. *United States*, supra, 539 U.S. 180]. The power to bring an accused to trial is fundamental to a scheme of ordered liberty and prerequisite to social

---

[11] As we explain more fully hereinafter, that standard was set forth by the United States Supreme Court in *Sell* v. *United States*, 539 U.S. 166, 179–81, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003).

justice and peace. *Illinois* v. *Allen*, 397 U.S. 337, 347, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (Brennan, J., concurring). It surely is not an overstatement to observe that the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate. Thus, when an individual commits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial. Recognizing this important governmental interest, the [United States] Supreme Court has held that in some circumstances, forced medication to render a defendant competent to stand trial for a crime that [that person] is charged with committing may be constitutionally permissible, even though the circumstances in which it is appropriate may be rare. See *Sell* [v. *United States*, supra, 180]. As the [United States Supreme] Court stated . . . [in *Sell*]:

"[T]he [c]onstitution permits the [g]overnment involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests. [Id., 179].

"Articulating a standard for determining the circumstances in which the government may obtain a court order to medicate involuntarily a defendant to render him competent to stand trial, the [United States] Supreme Court has focused on the competing interests of the defendant and the government." (Internal quotation marks omitted.) *United States* v. *Bush*, 585 F.3d 806, 813 (4th Cir. 2009). This standard requires the government to satisfy a four part test. "First, it must show

that important governmental interests are at stake. . . . An important governmental interest exists when the defendant is accused of a serious crime and [s]pecial circumstances do not undermine the government's interest in trying him for that crime. . . . Second, it must show that involuntary medication will significantly further the state's interest. . . . In other words, it must show that the involuntary administration of the medication is both (a) substantially likely to render the defendant competent to stand trial and (b) substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. . . . Third, it must show that involuntary medication is necessary to further its interests by showing that any alternative, less intrusive treatments are unlikely to achieve substantially the same result. . . . Fourth, it must show that the administration of the drugs is medically appropriate, or that it is in the defendant's best medical interest in light of his medical condition." (Citations omitted; internal quotation marks omitted.) *United States* v. *Evans*, 404 F.3d 227, 235 (4th Cir. 2005), quoting *Sell* v. *United States*, supra, 539 U.S. 180–81.

With these principles in mind, we turn to the defendant's claim that the trial court improperly determined that the charges against him are sufficiently serious to justify involuntary medication. A trial court's determination as to the seriousness of a crime for purposes of applying the first *Sell* factor presents a question of law over which our review is plenary. See, e.g., *United States* v. *Hernandez-Vasquez*, 513 F.3d 908, 915 (9th Cir. 2008); *United States* v. *Gomes*, 387 F.3d 157, 160 (2d Cir. 2004), cert. denied, 543 U.S. 1128, 125 S. Ct. 1094, 160 L. Ed. 2d 1081 (2005).

Although this court has not yet had occasion to apply the *Sell* factors in reviewing the propriety of an order

of involuntary medication,[12] all of the federal circuit courts that have done so have looked to the potential penalty that may be imposed in determining whether a crime is serious. See, e.g., *United States* v. *Fazio*, 599 F.3d 835, 840 (8th Cir. 2010); *United States* v. *Green*, 532 F.3d 538, 547 (6th Cir. 2008), cert. denied, 556 U.S. 1270, 129 S. Ct. 2735, 174 L. Ed. 2d 250 (2009); *United States* v. *Gomes*, supra, 387 F.3d 160–61. "Courts of appeals have split [however] on which test to employ

---

[12] In *State* v. *Jacobs*, 265 Conn. 396, 400, 828 A.2d 587 (2003), this court recognized that the standard set forth in *Sell* "superseded" the standard that this court previously had adopted in *State* v. *Garcia*, 233 Conn. 44, 658 A.2d 947 (1995), for determining whether an order of involuntary medication, intended solely for the purpose of restoring a defendant's competence to stand trial, is constitutionally permissible. In *Jacobs*, the trial court granted the state's request that the defendant, Earl Jacobs, be medicated involuntarily pursuant to General Statutes (Rev. to 2003) § 54-56d (k) (2). See *State* v. *Jacobs*, supra, 397–98. Jacobs appealed from the court's decision to the Appellate Court, claiming, inter alia, that that decision violated his rights under the first, sixth and fourteenth amendments to the United States constitution. Id., 398. The state contended that "review of the trial court's [decision] was limited to whether involuntary medication would violate [Jacobs'] fourteenth amendment rights." Id. The Appellate Court agreed with Jacobs that the trial court's decision implicated his "first and sixth amendment rights"; id.; but concluded that that decision comported with the standard set forth in *Garcia* and, therefore, affirmed. Id., 398–99. Both Jacobs and the state sought certification to appeal from the judgment of the Appellate Court. We granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the defendant had first and sixth amendment rights that the trial court must consider during a hearing pursuant to . . . § 54-56d (k) (2) and *State* v. *Garcia*, [supra, 44]?" *State* v. *Jacobs*, 261 Conn. 929, 930, 806 A.2d 1068 (2002). While the appeal was pending, however, the United States Supreme Court issued its decision in *Sell*. Thereafter, in a per curiam opinion, we remanded the case to the trial court for a determination of the constitutionality of involuntarily medicating Jacobs in light of the standard set forth in *Sell*. *State* v. *Jacobs*, supra, 265 Conn. 400. In so doing, we noted that the standard that the United States Supreme Court adopted in *Sell* "differ[ed] from the standard adopted by this court in *State* v. *Garcia*, supra, [84–86], in several respects." *State* v. *Jacobs*, supra, 265 Conn. 399. In particular, we noted that, "[r]elevant to the limited certified question before this court, *Sell* requires that the trial court consider a defendant's fair trial rights, which are encompassed by the sixth amendment [and made applicable to the states through the due process clause of the fourteenth amendment]." Id., 400.

in determining [the] seriousness of [a] crime. Some [courts] look to the maximum statutory penalty, while others calculate the defendant's probable sentencing range under the [federal] [s]entencing [g]uidelines . . . ." *United States* v. *Grape*, 549 F.3d 591, 600 (3d Cir. 2008).

In adopting the maximum statutory penalty approach in *United States* v. *Evans*, supra, 404 F.3d 227, the Fourth Circuit Court of Appeals noted that, "[a]lthough the [c]ourt in *Sell* offered no guidance on how to determine the seriousness of an offense, the [United States] Supreme Court has described 'serious' crimes in other contexts. In *Duncan* v. *Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968), for example, the Supreme Court observed that the [s]ixth [a]mendment's right to trial by jury exists only in 'serious' criminal cases. [Id., 158]. It admonished that 'the penalty authorized for a particular crime is of major relevance in determining whether it is serious.' [Id., 159] . . . . In fact, it explicitly rejected Louisiana's argument that the proper focus of whether a crime is 'serious' for purposes of the [s]ixth [a]mendment right to trial is the actual 'length of punishment.' [Id., 162 n.35]. More recent right-to-jury cases have explicitly found that the primary measure of seriousness is 'the maximum penalty attached to the offense.' . . . *Lewis* v. *United States*, 518 U.S. 322, 326, 116 S. Ct. 2163, 135 L. Ed. 2d 590 (1996)." *United States* v. *Evans*, supra, 237.

The Fourth Circuit concluded: "[I]n light of *Duncan* and its progeny, it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes. Such an approach respects legislative judgments regarding the severity of the crime . . . while at the same time giving courts an objective standard to apply . . . ." (Citations omitted.) Id.; see also *United States* v. *Green*, supra, 532 F.3d 549 ("the maximum statutory

penalty is the most objective means of determining the seriousness of a crime and the standard we adopt"); cf. *United States* v. *Gomes*, supra, 387 F.3d 160 ("the seriousness of the crime and [the defendant's] perceived dangerousness to society are evident from the substantial sentence [that the defendant] faces if convicted"); but cf. *United States* v. *Hernandez-Vasquez*, supra, 513 F.3d 919 ("Although the sentencing guidelines no longer are mandatory, they are the best available predictor of the length of a defendant's incarceration. While the statutory maximum may be more readily ascertainable, any difficulty in estimating the likely guideline range exactly is an insufficient reason to ignore *Sell*'s direction that courts should consider the specific circumstances of individual defendants in determining the seriousness of a crime. Accordingly, we disagree with the Fourth Circuit and conclude that the likely guideline range is the appropriate starting point for the analysis of a crime's seriousness."); *United States* v. *Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) (analyzing seriousness in light of both statutory maximum and likely guideline sentence).

Because Connecticut does not have sentencing guidelines, the sentencing guideline approach to assessing the seriousness of a crime is not an option available to the courts of this state. As we previously have indicated, however, the defendant faces a mandatory *minimum* sentence of seven years imprisonment if he is convicted of three of the crimes with which he has been charged, namely, § 21a-278 (b), which provides for a mandatory minimum sentence of five years imprisonment, § 21a-279 (b), which provides for a maximum sentence of five years imprisonment for the first offense, and § 21a-279 (d), which provides for a mandatory, nonsuspendable sentence of two years imprisonment that is to run consecutively to any sentence imposed for violating § 21a-279 (a), (b) or (c). Moreover, one of the offenses

with which the defendant has been charged, namely, § 21a-278 (b), carries a maximum possible sentence of twenty years imprisonment. Even if we consider only the mandatory minimum sentence that the defendant faces if convicted under §§ 21a-278 and 21a-279, however, and not the maximum *combined* sentences that could be imposed if he is convicted of all charges, it is apparent that the charges pending against the defendant are serious.[13] See, e.g., *United States* v. *Green,* supra, 532 F.3d 549 (possession of crack cocaine with intent to distribute, which carried mandatory minimum sentence of ten years imprisonment, "[u]nquestionably" constituted serious crime); *United States* v. *Hernandez-Vasquez,* supra, 513 F.3d 911–12 and n.1, 919 (stating in dictum that crime of illegal reentry into United States by person who previously had been deported for being convicted of aggravated felony, which carried probable sentence of approximately seven and one-half to nine and one-half years imprisonment under federal sentencing guidelines, could be deemed serious); see also *United States* v. *Evans,* supra, 404 F.3d 238 ("[w]e think it beyond dispute that the [g]overnment . . . [has] an important interest in trying a defendant charged with a felony carrying a *maximum* punishment of [ten] years imprisonment" [emphasis added]). In focusing on only three of the six drug offenses with which the defendant has been charged, we "do not imply that [a court] may not aggregate charges when determining whether the

---

[13] We do not discount the possibility that, at a hearing conducted in accordance with § 54-56d (k) (2), an accused might be able to adduce probative, credible evidence of the likely penalty that he or she faces if convicted as charged. In such circumstances, the trial court would be required to consider that evidence, together with all other relevant evidence, in assessing the state's interest in bringing the defendant to trial. In the present case, however, the defendant offered no evidence with respect to the sentence that he likely would receive if convicted of the charged offenses. In fact, at no point during the competency proceedings did the defendant expressly challenge the state's assertion that, as a matter of law, those crimes were serious for purposes of § 54-56d (k) (2).

[state] has an important interest." *United States* v. *Evans*, supra, 238 n.8. In the present case, however, we believe that the state's interest is important on the basis of the seriousness of those three offenses. See id.

Our conclusion that the charges in this case are serious, however, does not end our inquiry. As we previously have explained, in evaluating the state's interest in prosecuting the defendant, we also "must consider the facts of the individual case," bearing in mind that "[s]pecial circumstances may lessen the importance of that interest." *Sell* v. *United States*, supra, 539 U.S. 180. In *Sell*, the court offered two examples of special circumstances that might undermine the state's interest in proceeding against a defendant. First, it observed that a defendant's unwillingness to take medication could result in "lengthy confinement in an institution for the mentally ill," an eventuality that "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Id. Second, the court noted "the possibility that the defendant has already been confined for a significant amount of time . . . for which he would receive credit toward any sentence ultimately imposed . . . ." Id.

In the present case, the defendant contends that the state's interest in bringing him to trial is undermined by the fact that the crimes with which he has been charged are all nonviolent, victimless offenses involving the recreational use of marijuana rather than the sale or distribution of that drug. At oral argument before this court, the defendant further contended that, in assessing the state's interest, this court should take into account society's growing tolerance of marijuana use, as evidenced by the movement in some states to decriminalize the recreational use of that drug and by the fact

that several states already have permitted it to be used for medical purposes.[14] We are not persuaded.

First, the defendant is not charged merely with possession of marijuana; he is charged with manufacturing the drug and possessing it with the intent to sell. As we previously have indicated, at the time of the defendant's arrest, the police discovered fifty marijuana plants growing in his home and approximately two pounds of marijuana in his refrigerator, along with a digital scale and various accoutrements associated with the cultivation of marijuana. In light of the quantity of marijuana involved and the nature of the other seized evidence, we cannot conclude, as a matter of law, that the charges against the defendant are not serious, or that they are unfounded or otherwise lacking in significance.[15] Although the defendant may be able to rebut the state's contention that the large quantity of marijuana found in his home was intended for sale or distribution and not merely for personal use, that issue is one for the jury, not this court, to evaluate and decide.

We also disagree with the defendant that the nonviolent nature of the offenses militates against the state's interest in bringing him to trial. As the United States

---

[14] The defendant also claims that the state's interest in trying him is undermined by the fact that he does not pose a threat to himself or others. As the state maintains, however, the standard set forth in *Sell* is applicable *only when* involuntary medication is *not justified* on the ground of dangerousness. See *Sell* v. *United States*, supra, 539 U.S. 181–82 ("[a] court need not consider whether to allow forced medication [to render a defendant competent for trial], if forced medication is warranted for a different purpose, such as the purposes set out in [*Washington* v. *Harper*, supra, 494 U.S. 210] related to the individual's dangerousness"); *United States* v. *Gomes*, supra, 387 F.3d 160 ("[t]he *Sell* factors control when the sole purpose of the forced chemical treatment is to render a defendant competent for trial; therefore, a threshold inquiry is whether the forced treatment is justified for other reasons, such as those related to [the defendant's] dangerousness" [internal quotation marks omitted]).

[15] We note that the defendant does not claim that the state has overcharged him to increase his maximum exposure for an improper purpose.

Court of Appeals for the Sixth Circuit stated in rejecting a similar claim: "[W]e simply cannot conclude that only violent crimes are serious for purposes of this analysis. There are any number of criminal behaviors that do not involve crimes of violence that are serious matters. Indeed, the [court in] *Sell* . . . [concluded] that fraud was a serious crime. See *Sell* [v. *United States*, supra, 539 U.S. 180]; see also *United States* v. *Valenzuela-Puentes*, [supra, 479 F.3d 1226–27] (finding . . . charge [of unlawful reentry into the United States by a person who previously had been deported for being convicted of an aggravated felony] a serious crime despite there being no indication that the [underlying] conduct . . . was violent or harmful to others for purposes of *Sell* analysis). . . .

"[Furthermore], we do not subscribe to the theory that the legislative branch considers drug-trafficking crimes as victimless, regardless of the scale of the operation. If a criminal defendant possesses an illegal substance with the intent to distribute that substance to others, unquestionably there are victims. The lack of an identifiable person . . . does not equate to a completely victimless crime. . . . Society as a whole is the victim when illegal drugs are being distributed in its communities." (Internal quotation marks omitted.) *United States* v. *Green*, supra, 532 F.3d 548–49.

In *United States* v. *Hernandez-Vasquez*, supra, 513 F.3d 908, the United States Court of Appeals for the Ninth Circuit recently expressed a similar view. "No circuit court has interpreted *Sell* as allowing a categorical analysis of a crime's seriousness, such as a distinction between crimes malum in se and malum prohibitum. Similarly, we read *Sell*'s reference to crimes against property and the person as describing only a subset of the crimes serious enough to support an important government[al] interest in prosecution. A contrary reading would ignore the breadth of the

[United States] Supreme Court's concern that the [g]overnment be able to bring an accused to trial, which it described as fundamental to a scheme of ordered liberty and prerequisite to social justice and peace. [*Sell* v. *United States*, supra, 539 U.S. 180] . . . . *Sell* does not suggest that non-property, non-violent crimes, such as those arising under federal drug or immigration laws, are not fundamental to a scheme of ordered liberty." (Internal quotation marks omitted.) *United States* v. *Hernandez-Vasquez*, supra, 917–18. Consistent with the view expressed in *Green* and *Hernandez-Vasquez*, we reject the defendant's contention that the nonviolent nature of his offenses undermines the state's interest in prosecuting him. On the contrary, for the reasons set forth previously, we are persuaded that, as a general matter, the proper measure of a crime's seriousness is the penalty that the legislature has attached to it.

In addition, we are not persuaded by the defendant's argument that society's increasing tolerance of marijuana use, or the fact that some states have taken steps to decriminalize the recreational use of that drug, diminishes the state's interest in this case. Notwithstanding the movement afoot in some quarters to repeal or modify laws banning the use and possession of marijuana, the fact remains that "[m]arijuana is a schedule I controlled substance [in Connecticut]. See General Statutes § 21a-243 (c); Regs., Conn. State Agencies § 21a-243-7 (c) (20) . . . . [Sections] 21a-277 (b) and 21a-278 (b) make it illegal to manufacture, distribute, sell, prescribe, dispense, compound, transport with intent to sell or dispense, possess with intent to sell or dispense, offer, give or administer marijuana to another person. . . . Additionally, a violation of §§ 21a-277 (b), 21a-278 (b) or 21a-279 (c) within 1500 feet of a public or private elementary or secondary school, licensed child day care center, or public housing project carries a more stringent penalty." (Citations omitted.) *State* v. *Padua*, 273

Conn. 138, 152–54, 869 A.2d 192 (2005). "Thus, the Connecticut legislature has made the clear determination that marijuana is a dangerous substance from which [all of our citizens and] children, especially, should be protected." Id., 154–55.

Thus, if we were to adopt the defendant's position, we necessarily "would [be] usurp[ing] the legislature's role and . . . vitiat[ing] what is an inherently legislative determination" that marijuana is a dangerous substance. *State* v. *Heinemann*, 282 Conn. 281, 310, 920 A.2d 278 (2007). "The categorization of offenses is a legislative judgment, and, generally speaking, it is not the prerogative of courts in this area lightly to launch an inquiry to resolve a debate which has already been settled in the legislative forum. . . . [Rather] [w]e defer to the broad authority that legislatures possess in determining the types and limits of punishment for crimes." (Citations omitted; internal quotation marks omitted.) Id., 310–11.

Finally, we consider whether "[t]he defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill . . . [a fact] that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell* v. *United States*, supra, 539 U.S. 180. As *Sell* directs, we also must consider whether the defendant already has been confined for a significant amount of time for which he would receive credit toward any future sentence. Id. With respect to the first factor, the defendant does not contend, and there is nothing in the record to indicate, that he would be a candidate for civil commitment if he is not restored to competency through involuntary medication. See *United States* v. *Gomes*, supra, 387 F.3d 161 (noting that lack of evidence that defendant would qualify for civil commitment weighed in favor of government's interest in prosecuting him). With respect to the second

factor, at oral argument before this court on March 15, 2010, appellate counsel represented that the defendant already had been confined for twenty-eight months. Adding to that the time that has elapsed since that date, in addition to the two months that it is likely to take to restore the defendant to competency,[16] we calculate that the defendant will have been confined for approximately three years and three months if his trial commences at the earliest possible moment. In view of the fact that the defendant faces a mandatory minimum sentence of seven years imprisonment, and, in the discretion of the court, the possibility of an even longer period of incarceration, we are persuaded that the length of the defendant's pretrial confinement, although not insubstantial, does not significantly undermine the state's interest in trying him. This is so because, even if the defendant is sentenced to no more than the mandatory minimum term of seven years imprisonment, he still would have the majority of that sentence to serve. See, e.g., *United States* v. *Bush*, supra, 585 F.3d 815 ("even though [the defendant] can make a serious argument that the time she has already served in prison is sufficiently long to cover, or almost cover, any sentence that reasonably could be anticipated, this fact alone [did] not defeat [the government's interest]" [internal quotation marks omitted]); *United States* v. *Green*, supra, 532 F.3d 551 ("having . . . been confined [only] for three years, [the defendant] would still have the majority of a ten year mandatory minimum sentence to serve, at the least"). Accordingly, consideration of all of the special circumstances that exist leads us to conclude that the state has an important interest in trying the defendant.

In reaching our conclusion, however, we are mindful that the experts who previously testified at the hearings

---

[16] Experts testified at the defendant's prior competency hearings that it would take approximately two months to restore the defendant to competency.

on the defendant's competency agreed that the defendant would be restored to competency quickly and with minimal side effects using medication that is standard in the treatment of bipolar disorder. The defendant has not challenged that testimony on appeal. Indeed, the defendant himself represented to the trial court that he had experienced no side effects during a prior restoration. We also are mindful that the trial court, in entering its order, did so on the condition that the defendant would be closely monitored for possible adverse side effects, thereby minimizing any risk to the defendant's health. In light of these considerations, and for the reasons previously set forth in this opinion, we agree with the state that the trial court properly determined, in view of all the special circumstances that had been brought to its attention, that the seriousness of the defendant's alleged crimes justifies an order of involuntary medication.

The decision of the trial court is affirmed.

In this opinion the other justices concurred.