******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LISHAN WANG
(SC 19637)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.*

*Argued May 5—officially released September 13, 2016*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *Eugene Calistro, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The issue that we must resolve in this appeal is whether the trial court properly granted the state's motion to forcibly medicate the defendant, Lishan Wang, in order to restore his competency to stand trial. The defendant was charged with murder and various other offenses in connection with the shooting death of Vajinder Toor in the town of Branford on April 26, 2010. Over the next several years, the defendant was found incompetent to stand trial, restored to competency, and then found incompetent again. After the second finding of incompetency, the trial court conducted evidentiary hearings on the question of whether the defendant should be forcibly medicated. The court ultimately concluded that the state had established by clear and convincing evidence that forcible medication of the defendant would not violate his federal due process rights under the test set forth in the decision of the United States Supreme Court in *Sell* v. *United States*, 539 U.S. 166, 180–81, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), and ordered that the defendant be forcibly medicated. This appeal followed.[1] The primary claim that the defendant raises on appeal is that the trial court incorrectly determined that it was "substantially likely" that forcibly medicating him would restore his competency to stand trial, as that phrase is used in *Sell*. Id., 181; see id. (to order involuntary administration of drugs for trial competence purposes, court "must find that [the] administration of the drugs is substantially likely to render the defendant competent to stand trial"). We disagree and affirm the decision of the trial court.

The record reveals the following undisputed facts and procedural history. On April 26, 2010, Toor, a physician, was shot and killed outside his residence in Branford. Later that day, the defendant, who also was a physician, was arrested and charged with Toor's murder, the attempted murder of Toor's wife, carrying a pistol without a permit and possession of a weapon in a motor vehicle. On September 28, 2010, the trial court, *Fasano, J.*, found the defendant incompetent to stand trial but restorable, and ordered that he be admitted to the Whiting Forensic Division of Connecticut Valley Hospital (Whiting) for treatment. Thereafter, Judge Fasano found that the defendant had been restored to competency and granted his motion to represent himself.

On January 30, 2015, Thomas Ullmann, the supervisor of the Office of the Public Defender for the judicial district of New Haven, filed a motion for the appointment of counsel, in which he requested that the trial court revoke the defendant's status as a self-represented party and appoint a public defender to represent him on the ground that the defendant was incompetent to represent himself. In support of this claim, Ullmann referred to hundreds of motions that the defendant had filed in the trial court, including at least seventy in

which the defendant had sought permission to obtain information from Kingsbrook Jewish Medical Center (Kingsbrook) in Brooklyn, New York, where the defendant had worked for two years with Toor until the defendant was terminated in May, 2008. In other motions, the defendant claimed that he had been wrongfully terminated by Kingsbrook because of false accusations made by Toor, claimed that the defendant, not Toor, was the real victim, and questioned the identification of Toor's body by the Office of the Chief Medical Examiner. After an evidentiary hearing, the trial court, *O'Keefe, J.*, found the defendant incompetent to stand trial and ordered that he again be admitted to Whiting for evaluation and treatment.[2] The trial court also ordered that a public defender represent the defendant until it could be determined whether treatment could restore him to competency.

On September 14, 2015, the trial court conducted a second competency hearing for the purpose of determining whether the defendant had been restored to competency. Mark S. Cotterell, a psychiatrist and forensic monitor employed by Whiting, testified at the hearing that he had been involved in the evaluation of the defendant from late 2010 until early 2011 during the defendant's first admission to Whiting. After the defendant was sent back to Whiting in April, 2015, Cotterell again had been assigned to evaluate him and to prepare a report. In performing this task, Cotterell met repeatedly with the defendant and with members of his treatment team, and reviewed his treatment records. Cotterell testified that the defendant had been diagnosed with "unspecified schizophrenia spectrum and other psychotic disorder." In Cotterell's opinion, the defendant was not competent to stand trial but could be restored to competency. Cotterell also testified that the least restrictive placement that would still be effective would be for the defendant to remain at Whiting as an inpatient. Cotterell further testified that there were medications that could help restore the defendant to competency, but the defendant did not believe that he had any psychiatric disorder and did not want to take any medications. According to Cotterell, studies showed that the success rate of such medications was "anywhere from the mid-50 percent range up to about 70 percent." Cotterell also testified that, "based on our clinical experience, we can probably get at least . . . that much, if not sometimes more, simply because the research doesn't always include longer term treatment." At the conclusion of the hearing, the trial court found that the defendant was incompetent to stand trial and that the "normal treatment" that Cotterell had described was "not going to work here."[3] The trial court appointed Gail Sicilia, a psychiatric advanced practice registered nurse employed by Yale University, as the defendant's health-care guardian pursuant to General Statutes § 54-56d (k) (3) (A). Finally, the trial court ordered that

Sicilia prepare a report setting forth her findings and recommendations concerning the forced administration of antipsychotic medication to the defendant.

On October 26, 2015, the trial court held an evidentiary hearing on the question of whether the defendant should be forcibly medicated. Cotterell testified at the hearing that, despite the ongoing efforts of the staff at Whiting, the defendant had not made any substantial progress toward competency since being admitted to Whiting in April, 2015.[4] Cotterell recommended that the defendant be treated with the antipsychotic medications Olanzapine and Ziprasidone. Cotterell testified that these medications had "a substantial likelihood of treating the symptoms" that the defendant was experiencing, "based on our clinical experience dealing with these kinds of patients and these kinds of medication." In addition, the published research indicated a "greater than 50 percent chance . . . that [those medications will result] in a substantial improvement in the [patient's] clinical state." Cotterell wrote in a memorandum documenting the proposed medication regimen for the defendant that the "[n]otable potential side effects" of Olanzapine are dizziness, dry mouth, joint pain, constipation, orthostatic hypotension,[5] and tachycardia, and that there is "some risk" of weight gain, hyperglycemia or sedation. A notable side effect is one that is either frequent or significant, or both. The "notable potential side effects" of Ziprasidone are dizziness, stiffness, sedation, nausea, dry mouth, skin rash and low blood pressure, and there is a "low [risk]" of weight gain or sedation with long-term use. Cotterell testified that "a lot of clients who use these medications . . . don't actually experience sedation" and that sedation was "not something that [one] would expect to be universally present." In addition, he testified that the staff at Whiting would carefully monitor the defendant and any side effects from his medications that could interfere with his ability to present a defense at trial and would report their observations to the court.

Sicilia testified at the October 26, 2015 hearing that she had met several times with the defendant, and also with Cotterell and others who provided care to the defendant at Whiting. Sicilia's observations of the defendant were consistent with Cotterell's diagnosis. Sicilia testified that, in her opinion, it would be in the defendant's best interest to be treated with antipsychotic medications, both for purposes of restoring him to competency to stand trial and for his general mental health. Specifically, she believed that the defendant's "delusions affect how he's functioning" and that the medications would "[decrease] the delusions to the point where he could ignore some of [them] . . . go about his daily living . . . [and] function at a higher level." When she suggested this course of treatment to the defendant, however, he adamantly refused, stating that he did not need medication and that he should not be

at Whiting. In Sicilia's professional opinion, there were no other treatments that would be less intrusive and that could restore the defendant to competency.

After the October 26, 2015 hearing, the state filed a motion, along with a supporting memorandum of law, requesting that the trial court order the administration of medication to the defendant, and the defendant filed a memorandum of law in opposition to forced medication. The trial court heard arguments on the issue on November 18, 2015, and, at the conclusion of the hearing, found that the state had proven all of the elements of the test set forth in *Sell* v. *United States*, supra, 539 U.S. 179–81, for establishing the constitutionality of an order of involuntary medication by clear and convincing evidence.[6] Accordingly, the court granted the state's motion for forced medication. Thereafter, the trial court supplemented its findings with a memorandum of decision in which it credited Cotterell's testimony that the recommended medications "are effective in restoring patients to competency from the mid-50 percent range up to 70 percent." The court concluded that this rate of effectiveness constituted a substantial likelihood that the defendant would be restored to competency for purposes of *Sell*. The court also concluded that the medications are "substantially unlikely to have side [e]ffects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense" and that there are no less intrusive treatments that would be effective. Finally, the court credited Sicilia's testimony that the administration of the medications would be medically appropriate and in the defendant's best medical interest.

This appeal followed. The defendant claims that the trial court incorrectly determined that the state proved by clear and convincing evidence that there is "a need for [forced medication] sufficiently important to overcome the [defendant's] protected interest in refusing it . . . ." *Sell* v. *United States*, supra, 539 U.S. 183. Specifically, the defendant contends that the state failed to prove that it is substantially likely that forced medication will restore him to competency because a 55 to 70 percent probability of restoration to competency does not constitute a substantial likelihood for purposes of *Sell*, and, even if it did, the state failed to prove that there was a 55 to 70 percent probability that forced medication would restore the defendant to competency. In addition, the defendant challenges the trial court's findings that (1) it is substantially unlikely that the side effects of forced medication will deprive the defendant of his right to a fair trial, (2) there is no less restrictive alternative to forced medication, and (3) the involuntary administration of medication is in the defendant's best medical interest. We conclude that the trial court applied the proper standard and that its findings were supported by clear and convincing evidence.

The following legal principles guide our analysis of the defendant's claims. "It is well established that [a]n individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome. [Id., 178–79] (quoting *Riggins* v. *Nevada*, 504 U.S. 127, 134, 135, 112 S. Ct. 1810, 118 L. Ed. 2d 479 [1992]). This is because [t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington* v. *Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). Indeed, it has been observed that when the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense. [Id., 237–38] (Stevens, J., dissenting).

"At the same time, the government has a significant interest in bringing a person accused of a serious crime to trial. See *Sell* [v. *United States*, supra, 539 U.S. 180]. The power to bring an accused to trial is fundamental to a scheme of ordered liberty and prerequisite to social justice and peace. *Illinois* v. *Allen*, 397 U.S. 337, 347, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (Brennan, J., concurring). It surely is not an overstatement to observe that the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate. Thus, when an individual commits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial. Recognizing this important governmental interest, the [United States] Supreme Court has held that in some circumstances, forced medication to render a defendant competent to stand trial for a crime that [that person] is charged with committing may be constitutionally permissible, even though the circumstances in which it is appropriate may be rare. See *Sell* [v. *United States*, supra, 180]. As the [United States Supreme] Court stated . . . [in *Sell*]:

"[T]he [c]onstitution permits the [g]overnment involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests. [Id., 179].

"Articulating a standard for determining the circumstances in which the government may obtain a court order to medicate involuntarily a defendant to render him competent to stand trial, the [United States] Supreme Court has focused on the competing interests

of the defendant and the government. . . . *United States* v. *Bush*, 585 F.3d 806, 813 (4th Cir. 2009). This standard requires the government to satisfy a four part test. First, it must show that important governmental interests are at stake. . . . An important governmental interest exists when the defendant is accused of a serious crime and [s]pecial circumstances do not undermine the government's interest in trying him for that crime. . . . Second, it must show that involuntary medication will significantly further the state's interest. . . . In other words, it must show that the involuntary administration of the medication is both (a) substantially likely to render the defendant competent to stand trial and (b) substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. . . . Third, it must show that involuntary medication is necessary to further its interests by showing that any alternative, less intrusive treatments are unlikely to achieve substantially the same result. . . . Fourth, it must show that the administration of the drugs is medically appropriate, or that it is in the defendant's best medical interest in light of his medical condition.[7] . . . *United States* v. *Evans*, 404 F.3d 227, 235 (4th Cir. 2005), quoting *Sell* v. *United States*, supra, 539 U.S. 180–81." (Footnote added; internal quotation marks omitted.) *State* v. *Seekins*, 299 Conn. 141, 154–56, 8 A.3d 491 (2010).

The court in *Sell* did not prescribe the standard of appellate review of the trial court's conclusions with respect to the four factors for determining the constitutionality of forced medication. Most federal circuit courts of appeals have concluded, however, that the first prong, regarding the government's interest in restoring the defendant to competency, is a question of law subject to de novo review and the remaining prongs are factual questions subject to review for clear error. See *United States* v. *Dillon*, 738 F.3d 284, 291 (D.C. Cir. 2013) (citing cases). Although we generally agree with this approach, we disagree that the second prong presents a pure question of fact. Rather, we conclude that, for purposes of determining whether "the involuntary administration of the medication is both (a) substantially likely to render the defendant competent to stand trial and (b) substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"; (internal quotation marks omitted) *State* v. *Seekins*, supra, 299 Conn. 156; the meanings of the terms "substantially likely" and "substantially unlikely" are questions of law subject to de novo review. This is because, as we discuss subsequently in this opinion, these terms have no fixed, mathematical meanings that can be readily understood and applied by an expert or fact witness; rather, their meanings vary depending on the legal interests involved, which are questions for

the court. Whether the state has satisfied those legal standards, however, is a question of fact. We review the trial court's factual findings for clear error, which occurs "when there is no evidence in the record to support [the court's finding of fact], or when, although there is evidence to support the factual finding, the reviewing court, upon consideration of the entire record, is left with a definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264 n.35, 112 A.3d 1 (2015).

The court in *Sell* also did not prescribe the government's standard of proof. Most federal courts that have considered the issue, however, have concluded that the *Sell* factors must be proven by clear and convincing evidence. See, e.g., *United States* v. *Diaz*, 630 F.3d 1314, 1331 (11th Cir.) ("[o]ther circuit courts that have considered this issue uniformly concluded that in *Sell* cases the government bears the burden of proof on factual questions by clear and convincing evidence"), cert. denied,      U.S.      , 132 S. Ct. 128, 181 L. Ed. 2d 49 (2011). In light of the nature and importance of the right at issue, we agree with and adopt that standard. Cf. *State* v. *Garcia*, 233 Conn. 44, 86, 658 A.2d 947 (1995) (before United States Supreme Court's decision in *Sell*, state was required to demonstrate factors supporting order of forced medication by clear and convincing evidence), overruled in part on other grounds sub silentio by *Sell* v. *United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003).

I

With these principles in mind, we turn to the defendant's claim that the trial court incorrectly determined that forced medication "is substantially likely to render [him] competent to stand trial." *Sell* v. *United States*, supra, 539 U.S. 181. We disagree.

The defendant contends that, even if credited, Cotterell's testimony that the recommended medications are effective in restoring patients to competency from "the mid-50 percent range up to [the] 70 percent" range does not constitute clear and convincing evidence that there is a substantial likelihood that the medications will restore him to competency. In support of this contention, the defendant relies on cases holding that a success rate of slightly higher than 50 percent does not constitute a substantial likelihood for purposes of *Sell*. See *United States* v. *Arendas*, United States District Court, Docket No. 1:10-CR-123 (TS) (D. Utah May 6, 2013) ("a roughly 60 [percent] success rate" does not constitute substantial likelihood for purposes of *Sell*); *United States* v. *Rivera-Morales*, 365 F. Supp. 2d 1139, 1141 (S.D. Cal.) ("[a]lthough the court declines to determine the exact percentage of success that equates with a substantial likelihood that a defendant's competency is restored, it is clear that a chance of success that is

simply more than a 50 [percent] chance of success does not suffice to meet this standard"), aff'd, 160 Fed. Appx. 648 (9th Cir. 2005); *People* v. *McDuffie*, 144 Cal. App. 4th 880, 887, 50 Cal. Rptr. 3d 794 (2006) (50 to 60 percent chance of restoration "is simply not enough to support the trial court's finding that these drugs are substantially likely to render [the defendant] competent to stand trial" [internal quotation marks omitted]); *State* v. *Barzee*, 177 P.3d 48, 61 (Utah 2007) ("[t]o the extent that [a substantial] likelihood can be quantified, it should reflect a probability of more than [70] percent"), cert. denied, 553 U.S. 1056, 128 S. Ct. 2477, 171 L. Ed. 2d 771 (2008); see also *United States* v. *Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) ("[Under *Sell*] the government establishes a fact by clear and convincing evidence only if the evidence place[s] in the ultimate [fact finder] an abiding conviction that the truth of its factual contentions are highly probable. . . . This would be true, of course, only if the material it offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence . . . offered in opposition." [Citation omitted; internal quotation marks omitted.]).[8]

For the following reasons, we do not agree with these cases and instead conclude that a substantial likelihood that the defendant will be restored to competency exists when the state establishes that it is more likely than not that forced medication will be effective. First, most of the cases on which the defendant relies do not engage in any analysis of the meaning of the term "substantially likely" but merely state conclusorily that a 50 percent probability does not satisfy that standard. See *United States* v. *Decoteau*, 904 F. Supp. 2d 235, 241 (E.D.N.Y. 2012) ("[n]o controlling case law defines substantially likely with precision" [internal quotation marks omitted]). In the two cases that do engage in some analysis, the courts focused not on the meaning of "substantially likely" but on the meaning of "clear and convincing evidence." *United States* v. *Valenzuela-Puentes*, supra, 479 F.3d 1228 ("the government establishes a fact by clear and convincing evidence only if the evidence place[s] in the ultimate [fact finder] an abiding conviction that the truth of its factual contentions are highly probable" [internal quotation marks omitted]); see also *United States* v. *Arendas*, supra, United States District Court, Docket No. 1:10-CR-123 (TS) (citing *Valenzuela-Puentes* for proposition that substantial likelihood fosters "an abiding conviction [that it is] highly probable" [internal quotation marks omitted]). For purposes of making this predictive judgment, however, we believe that the clear and convincing evidence standard pertains to the *confidence level* of the fact finder, not the specific degree of probability that the state must establish. See *Fish* v. *Fish*, 285 Conn. 24, 69, 939 A.2d 1040 (2008) ("[t]he function of a standard of proof, as that concept is embodied in the [d]ue [p]rocess [c]lause and

in the realm of [fact-finding], is to instruct the [fact finder] concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication" [internal quotation marks omitted]); see also id., 134 (*Katz, J.*, concurring) ("[Clear and convincing evidence] eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence . . . . It should produce in the [fact finder's] mind a firm belief or conviction regarding the truth of the allegations sought to be established." [Internal quotation marks omitted.]). We note, for example, that § 54-56d (k) (2) provides in relevant part that "the court may order the involuntary medication of the defendant if the court finds by clear and convincing evidence that: (A) [t]o a reasonable degree of medical certainty, involuntary medication of the defendant will render the defendant competent to stand trial . . . ." A reasonable degree of medical certainty means that restoration to competency is more likely than not. See *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987). Thus, § 54-56d (k) (2) requires the state to prove by clear and convincing evidence that it is more likely than not that the defendant will be restored to competency.

Second, contrary to the implicit suggestion of the cases holding without analysis that a slightly greater than 50 percent probability is not a substantial likelihood for purposes of *Sell*, the term "substantially likely" has no objective, mathematical meaning. Rather, its meaning depends on the context in which it is used. Compare *Southern Utah Wilderness Alliance* v. *Thompson*, 811 F. Supp. 635, 641 (D. Utah 1993) (for purposes of ruling on request for injunction, "whether [the] [p]laintiffs have a substantial likelihood of success is judged by whether [they] have a reasonable probability of success" [internal quotation marks omitted]), with *Clinton County R-III School District* v. *C.J.K.*, 896 F. Supp. 948, 950 (W.D. Mo. 1995) (for purposes of statute requiring public schools to keep child in educational setting last agreed to by school and parents unless placement is substantially likely to result in injury to child or others, "5 [percent] danger of *material* personal injury or some appreciable danger of *serious* personal injury" constitutes "substantial likelihood" [emphasis in original]).

Third, there is no indication that the court in *Sell* intended to *change* the standards that it previously had enunciated for determining whether an individual may be forcibly medicated to restore competency to stand trial. Rather, the court in *Sell* expressly incorporated the standards set forth in its previous decisions in *Washington* v. *Harper*, supra, 494 U.S. 210,[9] and *Riggins* v. *Nevada*, supra, 504 U.S. 127.[10] See *Sell* v. *United States*, supra, 539 U.S. 178 (*Harper* and *Riggins* "set forth the framework for determining the legal answer" in *Sell*); id., 180 (standard set forth in *Sell* was "fairly implie[d]"

by *Harper* and *Riggins*). This court previously has held that, under *Harper* and *Riggins*, the state must demonstrate, "to a reasonable degree of medical certainty, [that] involuntary medication of the defendant will render him competent to stand trial . . . ." (Footnotes omitted.) *State* v. *Garcia*, supra, 233 Conn. 84–85; see also *United States* v. *Weston*, 134 F. Supp. 2d 115, 132 (D.D.C.) (applying *Harper* and *Riggins* and concluding that, "[a]lthough . . . it is not certain that the medication will restore [the defendant's] competency, the [c]ourt credits the . . . testimony of the mental health experts that this outcome is likely"), aff'd, 255 F.3d 873 (D.C. Cir.), cert. denied, 534 U.S. 1067, 122 S. Ct. 670, 151 L. Ed. 2d 583 (2001);[11] *Woodland* v. *Angus*, 820 F. Supp. 1497, 1511 (D. Utah 1993) (under *Harper* and *Riggins*, "the court must consider whether to a reasonable degree of medical certainty the treatment would render the [defendant] competent"); cf. *United States* v. *Sanchez-Hurtado*, 90 F. Supp. 2d 1049, 1055 (S.D. Cal. 1999) (under *Riggins*, "the government must show that there is a sound medical basis for treatment with antipsychotic medication" [internal quotation marks omitted]); *Khiem* v. *United States*, 612 A.2d 160, 165–66 (D.C. 1992) (under *Riggins*, "[t]he government cannot intrude [on a defendant's] bodily integrity without a showing of overriding justification and medical appropriateness"), cert. denied, 507 U.S. 924, 113 S. Ct. 1293, 122 L. Ed. 2d 684 (1993).

To be sure, the court in *Sell* stated that the instances in which the constitution permits forced medication to restore a defendant to competency "may be rare." *Sell* v. *United States*, supra, 539 U.S. 180. As one commentator has noted, however, "[t]he part of the *Sell* test most likely to cause courts to deny the government's petition to administer involuntary medications is the requirement that '*important* governmental interests [must be] at stake.' "[12] (Emphasis in original.) D. Klein, "Curiouser and Curiouser: Involuntary Medications and Incompetent Criminal Defendants After *Sell* v. *United States*," 13 Wm. & Mary Bill Rts. J. 897, 908 (2005). In addition to this requirement, the court also must find that forced medication is medically appropriate and in the defendant's best medical interest, and that no less intrusive treatments will achieve the same result. *Sell* v. *United States*, supra, 181. These standards alone will significantly narrow the class of defendants who are potentially subject to forced medication to restore competency to stand trial. We see no reason why the United States Supreme Court would have intended that there must be a substantial *further* narrowing of that class by requiring proof of a very high probability that forced medication will restore competency. See D. Klein, supra, 910 (requirement that government establish substantial likelihood that forced medication will render defendant competent to stand trial "is unlikely to limit the instances in which trial courts allow involuntary

medications"). Put another way, if the government can establish that it has an important interest in bringing the defendant to trial, that it will not be able to do so unless the defendant is medicated and that medication is medically appropriate and in the defendant's best medical interest, we can see no reason why the government should be further required to establish, not just that it is *more likely than not* that forced medication will restore the defendant to competency, but that it is *highly likely* that forced medication will have that effect.

Accordingly, we conclude that, for purposes of determining whether forced medication is substantially likely to render a defendant competent to stand trial under *Sell*, "substantially likely" means more likely than not, or a greater than 50 percent probability. In our view, in light of the other three prongs of *Sell* that, in and of themselves, provide significant protection to defendants who are potentially subject to orders of forced medication, a more stringent interpretation of the phrase "substantially likely" in *Sell* v. *United States*, supra, 539 U.S. 181, would place an undue burden on the state.

In the present case, Cotterell's testimony that the likelihood that the recommended medications will be effective in restoring patients to competency is *at least* in the mid-50 percent range, and could be as high as 70 percent, comfortably met this standard. Indeed, Cotterell testified that the likelihood of restoration could well exceed this estimate with longer term treatment. We therefore conclude that the trial court correctly determined that there was clear and convincing evidence that there was a substantial likelihood that the medications will restore the defendant to competency.

The defendant contends, however, that, even if a greater than 50 percent success rate constitutes a substantial likelihood for purposes of *Sell*, Cotterell's testimony was not sufficient to support the trial court's finding that it was substantially likely that he would be restored to competency because Cotterell did not testify regarding the success rate for patients with the defendant's specific psychiatric diagnosis and characteristics, including his current age, his age at the onset of his symptoms, and the length of time that he has experienced the symptoms but, rather, testified only about the general effectiveness of the recommended medications. We are not persuaded by this argument. Cotterell testified that he personally had met with and evaluated the defendant, and that his opinion was based on his "clinical experience dealing with *these kinds of patients* and these kinds of medication." (Emphasis added.) It is implicit in this testimony that, in Cotterell's professional judgment, there was nothing about the defendant's particular condition or circumstances that would significantly reduce the effectiveness of the medications.

To the extent that Cotterell relied on published research indicating a "greater than 50 percent chance . . . that [those medications will result in] a substantial improvement in the [patient's] clinical state," medical experts and courts simply have no choice but to rely on generalized studies when making such predictive judgments. See, e.g., D. Klein, supra, 13 Wm. & Mary Bill Rts. J. 910 ("[g]iven the current state of knowledge about the treatment of mental illnesses, courts presently have no choice but to base their decisions on generalized, rather than individualized, information about the likelihood that involuntary medications will render defendants competent to stand trial or infringe their right to a fair trial"); see also *United States* v. *Watson*, 793 F.3d 416, 441 (4th Cir. 2015) (Traxler, C. J., dissenting) ("if [general] studies do not bear on [the defendant's] particular medical condition, it seems unlikely that any academic literature short of a paper devoted entirely to the treatment of the actual defendant in question would meet the majority's unexplained standard for 'bearing' on an incompetent defendant's particular medical condition"). Accordingly, in the absence of evidence demonstrating why a general study has no application to the particular defendant, medical experts and courts properly may rely on such studies. See, e.g., *State* v. *Barzee*, supra, 177 P.3d 78 (when state's experts relied on their clinical experience and firsthand knowledge of defendant to support conclusion that there was substantial likelihood that forced medication would restore defendant to competency, their reliance on general studies regarding success rates of medications to further support their conclusion was proper). Although the defendant cites numerous cases that have criticized the use of general success rates and anecdotal studies for purposes of a *Sell* analysis,[13] he has not referred to any evidence *in the present case* that would support a finding that the studies on which Cotterell relied, which were not identified, were so general as to be useless for purposes of predicting the effectiveness of the recommended medications with respect to him. He also has not referred to any evidence that would support a finding that the medications that Cotterell recommended have a lower success rate for individuals with the defendant's specific diagnosis and characteristics.[14] We therefore conclude that the trial court's finding that there was a greater than 50 percent likelihood that forced medication would restore the defendant to competency was supported by clear and convincing evidence and was not clearly erroneous.

## II

We next address the defendant's claim that the trial court's finding that forced medication was "substantially unlikely to have side effects that will interfere significantly with [his] ability to assist counsel in conducting a trial defense, thereby rendering the trial

unfair"; *Sell* v. *United States*, supra, 539 U.S. 181; was clearly erroneous.[15] We also reject this claim.

In support of this prong of *Sell*, the state presented evidence that Olanzapine created only "some risk" of sedation. The evidence also showed that sedation was a "[n]otable potential side [effect]" of Ziprasidone, meaning that the side effect was either frequent or significant, or both, but there was only a low risk of sedation when used long term. In addition, Cotterell testified that "a lot of clients who use these medications . . . don't actually experience sedation" and that sedation was "not something that [one] would expect to be universally present." Cotterell further testified that the staff at Whiting would carefully monitor the defendant and any side effects from his medications that could interfere with his ability to present a defense at trial and would report their observations to the court.

We conclude that this evidence supports the trial court's finding that the recommended medications are substantially unlikely to produce side effects that will interfere with the defendant's ability to conduct a defense. With respect to Olanzapine, the evidence demonstrated that sedation is not a notable risk of the medication, that is, that side effect is neither frequent nor significant. With respect to Ziprasidone, although the evidence indicated that sedation is a notable risk of the medication, the evidence also indicated that there is only a "low" risk of sedation with long-term use. We therefore agree with the state that the trial court reasonably could have concluded, on the basis of this evidence, that, although sedation may be a frequent or significant *short-term* side effect of Ziprasidone, that side effect significantly *diminishes* over time as the patient develops a tolerance for the medication. In addition, because the staff at Whiting will continuously monitor the side effects of the medication and report their observations to the trial court, the court reasonably could have concluded that, if the defendant initially experienced significant sedation, there was no substantial likelihood that the defendant would be brought to trial before that side effect diminished sufficiently to allow the defendant to conduct a defense. In our view, the fact that a defendant is likely to experience a short-term side effect that could interfere with his right to a fair trial does not require the court to deny a request for forcible medication if it is substantially likely that the side effect will subside sufficiently to allow the defendant to conduct a defense. This is especially true when the medication will have no negative effect on the defendant's overall health. Accordingly, we reject the defendant's claim that the trial court's finding that it was substantially unlikely that forced medication would result in side effects that would interfere with his right to conduct a defense was not supported by clear and convincing evidence.

## III

We next address the defendant's claim that the trial court's finding that forced medication is necessary because "any alternative, less intrusive treatments are unlikely to achieve substantially the same results"; *Sell* v. *United States*, supra, 539 U.S. 181; was clearly erroneous. We disagree.

In support of this prong of *Sell*, Cotterell testified that, despite the ongoing efforts of the staff at Whiting, the defendant had not made any substantial progress toward being restored to competency from the time that he was admitted to Whiting in April, 2015, up to the October 26, 2015 hearing. Sicilia testified that there were no treatments other than forced medication that would be less intrusive and that could still restore the defendant to competency. We conclude that this testimony constituted clear and convincing evidence in support of the trial court's finding that alternative treatments were unlikely to achieve the substantially same results as forced medication.

In support of his claim to the contrary, the defendant contends that, during his first stay at Whiting in late 2010 through early 2011, he had been able to develop an effective therapeutic relationship with his privately retained therapist and had been restored to competency through psychotherapy and educational classes. The defendant presented no evidence during the competency hearings in 2015, however, to refute the evidence presented by the state with respect to this prong of *Sell* or that would support a finding that similar treatment would still be effective in restoring the defendant to competency. Accordingly, we reject this claim.

## IV

Finally, we address the defendant's claim that the trial court's finding that forced medication "is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition"; (emphasis omitted) *Sell* v. *United States*, supra, 538 U.S. 181; was clearly erroneous. We disagree.

In support of this prong of *Sell*, the state presented Sicilia's testimony that it would be in the defendant's best interest to be treated with antipsychotic medications, both for purposes of restoring him to competency to stand trial and for his general mental health. Sicilia further explained that the defendant's "delusions affect how he's functioning" and that the medications would "[decrease] the delusions to the point where he could ignore some of [them] . . . go about his daily living . . . [and] function at a higher level." We conclude that this testimony constituted clear and convincing evidence in support of the trial court's finding that forced medication would be in the defendant's best medical interest.

The defendant contends, however, that the state has not established that it is in his best medical interest to medicate him to reduce his delusional symptoms so that he is competent to stand trial, and then to stop the medications after trial. Specifically, he contends that the most likely result of forced medication in the long run will be to "reinforce his delusional beliefs that Whiting, along with the courts and his lawyers, is out to get him." As with his other claims, however, the defendant presented no evidence at the competency hearings that would support this claim. Moreover, when the sole purpose of ordering the administration of medication is to restore a defendant to competency to stand trial, there is always a possibility that the beneficial effects of the medication will last only as long as the trial because the sole basis for the order will disappear when the trial concludes. If that possibility were enough to bar an order of forced medication, it would be barred in every case. Accordingly, we reject this claim.

V

In summary, we conclude that the trial court correctly determined that it is substantially likely that forced medication will restore the defendant's competency to stand trial on the basis of Cotterell's testimony that the probability that the recommended medications will be effective is greater than 50 percent. We further conclude that the trial court's findings that it is substantially unlikely that the defendant will experience side effects that will adversely affect his ability to conduct a defense, that there are no less intrusive treatments that will achieve substantially the same effect, and that forced medication is in the defendant's best medical interest were supported by clear and convincing evidence. Accordingly, we conclude that the trial court correctly determined that the defendant constitutionally may be subject to forcible medication to restore his competency to stand trial under the standard set forth in *Sell*.

The decision of the trial court is affirmed.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Chief Justice Rogers was not present at oral argument, she has read the briefs and appendices, and has listened to a recording of oral argument prior to participating in this decision.

[1] This court concluded in *State* v. *Garcia*, 233 Conn. 44, 658 A.2d 947 (1995), overruled in part on other grounds sub silentio by *Sell* v. *United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), that an order of forcible medication is an appealable final judgment under the second prong of *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). See *State* v. *Garcia*, supra, 66 (under *Curcio*, " '[f]or an interlocutory order to be an appealable final judgment it must threaten the preservation of a right that the defendant already holds,' " and defendant had vested "right to be free from involuntary medication"); see also *Sell* v. *United States*, supra, 177 (order of forcible medication is "appealable 'collateral order' " under federal law). The defendant's appeal from the trial court's decision was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book

§ 65-1. Thereafter, this court granted the state's motion to expedite the appeal.

[2] Hereinafter, all references in this opinion to the trial court are to the court, *O'Keefe, J.*

[3] Cotterell testified that, if the trial court did not order the administration of medication, Whiting would continue its current course of treatment for the defendant, which included interviewing him, and offering him classes and feedback about his condition.

[4] In addition to this testimony, at the September 14, 2015 hearing, the state entered into evidence Cotterell's written report in which he stated that the defendant "will not attain competency within the remainder of the period covered by the placement order absent administration of psychiatric medication for which he is unwilling or unable to provide consent . . . ."

[5] Cotterell testified that orthostatic hypotension is a condition in which a person's blood pressure drops as the result of a change in body position, such as standing up. The drop in blood pressure can cause momentary confusion or weakness.

[6] See *Sell* v. *United States*, supra, 539 U.S. 179 ("the [federal] [c]onstitution permits the [g]overnment involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests"); see also id., 181 (to find that involuntary medication will significantly further state interests, court "must find that [the] administration of the drugs is substantially likely to render the defendant competent to stand trial" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"); id. (to find that involuntary medication is necessary to further state interests, court "must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results").

[7] We note that § 54-56d (k) (2), which was enacted before the United States Supreme Court decided *Sell*, also sets forth certain requirements that must be met before a defendant may be forcibly medicated. Section 54-56d (k) (2) provides in relevant part: "[T]he court may order the involuntary medication of the defendant if the court finds by clear and convincing evidence that: (A) To a reasonable degree of medical certainty, involuntary medication of the defendant will render the defendant competent to stand trial, (B) an adjudication of guilt or innocence cannot be had using less intrusive means, (C) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests, (D) the proposed drug regimen will not cause an unnecessary risk to the defendant's health, and (E) the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination." The defendant in the present case makes no claim that § 54-56d (k) (2) imposes a higher burden on the state than the standard set forth in *Sell*. Accordingly, if we determine that the trial court correctly concluded that the state established the relevant *Sell* factors by clear and convincing evidence, the corresponding factors of § 54-56d (k) (2) necessarily will be satisfied.

[8] Several courts have considered a likelihood of 70 percent or greater to be a substantial likelihood for purposes of *Sell*. See *United States* v. *Dillon*, supra, 738 F.3d 297 (73.3 percent likelihood of restoration to competency is substantial likelihood); *United States* v. *Diaz*, supra, 630 F.3d 1332 (75 to 87 percent likelihood is substantial likelihood); *United States* v. *Fazio*, 599 F.3d 835, 840–41 (8th Cir. 2010) (75 to 87 percent likelihood is substantial likelihood), cert. denied, 562 U.S. 1141, 131 S. Ct. 901, 178 L. Ed. 2d 759 (2011); *United States* v. *Green*, 532 F.3d 538, 553 (6th Cir. 2008) (more than 90 percent likelihood is substantial likelihood), cert. denied, 556 U.S. 1270, 129 S. Ct. 2735, 174 L. Ed. 2d 250 (2009); *United States* v. *Bradley*, 417 F.3d 1107, 1115 (10th Cir. 2005) (more than 80 percent likelihood is substantial likelihood); *United States* v. *Gomes*, 387 F.3d 157, 161–62 (2d Cir. 2004) (70 percent likelihood is substantial likelihood), cert. denied, 543 U.S. 1128, 125 S. Ct. 1094, 160 L. Ed. 2d 1081 (2005). We note, however, that these courts did not conclude that a 70 percent likelihood is the *minimum* probability that could constitute a substantial likelihood. But see *State* v. *Barzee*, supra, 177 P.3d 61 ("[T]he substantially likely standard requires that the chance

for restoration to competency be great. To the extent that such a likelihood can be quantified, it should reflect a probability of more than [70] percent.").

[9] The court in *Harper* considered the issue of whether forcible medication for the purposes of reducing a prison inmate's dangerousness to himself or others was consistent with constitutional due process principles. *Sell* v. *United States*, supra, 539 U.S. 178; see *Washington* v. *Harper*, supra, 494 U.S. 213–14, 221–23.

[10] The court in *Riggins* considered the circumstances under which it might be constitutionally permissible to forcibly medicate a defendant for the purpose of rendering him competent to stand trial. *Sell* v. *United States*, supra, 539 U.S. 178–79; see *Riggins* v. *Nevada*, supra, 504 U.S. 134–38.

[11] In *United States* v. *Weston*, 255 F.3d 873 (D.C. Cir.), cert. denied, 534 U.S. 1067, 122 S. Ct. 670, 151 L. Ed. 2d 583 (2001), the District of Columbia Circuit Court of Appeals affirmed the District Court's judgment; id., 887; concluding that the District Court's determination that restoration to competency was likely was supported by evidence demonstrating that the proposed antipsychotic medication mitigated symptoms for at least 70 percent of patients. Id., 883. Like most of the courts that have concluded that a 70 percent chance of restoration to competency constitutes a substantial likelihood under *Sell*; see footnote 8 of this opinion; the District of Columbia Circuit Court of Appeals did not hold in *Weston* that this rate of success was the *minimum* rate that would satisfy the requirements of *Harper* and *Riggins*. Rather, it is implicit in *Weston* that *Harper* and *Riggins* are satisfied if restoration to competency is likely.

[12] The defendant in the present case does not dispute that, for purposes of *Sell*, the state has an important interest in bringing to trial defendants who, like him, have been charged with murder.

[13] See, e.g., *United States* v. *Watson*, supra, 793 F.3d 425 ("It is critical that in evaluating the government's case for forcible medication under *Sell*, courts engage in the proper inquiry: not whether a proposed treatment plan is likely to work in general, but whether it is likely to work as applied to a particular defendant. Permitting the government to meet its burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment. . . . Because we are obligated to ensure that a given case is sufficiently exceptional to warrant the extraordinary measure of forcible medication, we cannot permit such deference . . . ." [Citation omitted; internal quotation marks omitted.]); *United States* v. *Evans*, supra, 404 F.3d 241 ("Instead of analyzing [the defendant] as an individual, the report simply sets up syllogisms to explain its conclusions: [1] atypical antipsychotic medications are generally effective, produce few side effects, and are medically appropriate, [2] [the defendant] will be given atypical antipsychotic medications, [3] therefore, atypical antipsychotic medication will be effective, produce few side effects, and be medically appropriate for [the defendant]. To hold that this type of analysis satisfies *Sell*'s second and fourth factors would be to find the government necessarily meets its burden in every case it wishes to use atypical antipsychotic medication.").

[14] Although the defendant has cited a number of articles and professional manuals that, according to him, support this claim, these materials were not presented as evidence in the proceedings before the trial court, and this court is not a fact-finding tribunal.

[15] We note that this prong of *Sell* requires the courts to focus exclusively on side effects of the medication that will affect the *fairness of the trial*. Whether the medication will have side effects that negatively affect the defendant's health is considered under the prong requiring courts to determine whether forced medication is in the patient's best medical interest. See *Sell* v. *United States*, supra, 539 U.S. 181 (in determining whether forced medication is in defendant's best medical interest, courts must take into account that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success"). In the present case, the defendant contends that the side effects of the medications that Cotterell recommended "may be permanent or life threatening." Because the defendant has referred to no evidence in the present case that would support such a contention, we decline to address this claim.